**Ezell ARMOUR, et al., Plaintiffs,**

v.

**The STATE of OHIO, et al., Defendants.**

**No. C88–1104Y.**

United States District Court,
N.D. Ohio, E.D.

Sept. 4, 1991.

Dissenting Opinion of District
Judge Batchelder Sept. 27, 1991.

Percy Squire, Bernadette J. Bollas, Bricker & Eckler, Columbus, Ohio, Robert A. Douglas, Sr., Youngstown, Ohio, for plaintiffs.

Andrew I. Sutter, Catherine M. Cola, Theresa R. Schaefer, Atty. Gen.'s Office, Columbus, Ohio, for defendants.

Before JONES, Circuit Judge, PECK, Senior Circuit Judge, and BATCHELDER, District Judge.

## OPINION AND ORDER

JOHN W. PECK, Senior Circuit Judge.

This three-judge district court was convened pursuant to the en banc decision of the United States Court of Appeals for the Sixth Circuit, 925 F.2d 987 (6th Cir.1991), in order to hear this challenge to the constitutionality of the apportionment of the Ohio House of Representatives. Plaintiffs allege that the boundary between House Districts 52 and 53 in Mahoning County deliberately and effectively dilutes the minority vote, and therefore violates the Fifteenth Amendment and the Voting Rights Act of 1965. For the reasons that follow, we find that the boundary violates both the plaintiffs' constitutional and statutory rights and order appropriate relief.

## I. BACKGROUND

### A. Prior Proceedings

This case was filed in the United States District Court for the Northern District of Ohio in May of 1988. The plaintiffs sought a temporary restraining order preventing the results of the May, 1988 primary election for districts 52 and 53 from being certified and a preliminary injunction prohibiting further elections in those districts until they were brought into compliance with federal law. The district court denied the temporary restraining order, ordered the injunction hearing consolidated with the trial on the merits, and referred both to a magistrate. The magistrate recommended that relief be denied because the plaintiffs could not constitute a majority in a reconfigured district, and the district court adopted the recommendation. On appeal, a panel of the United States Court of Appeals for the Sixth Circuit reversed, holding that the district court should have examined the totality of the circumstances to consider whether the political process in the contested districts is equally open to minority voters. However, the Sixth Circuit voted en banc to vacate the panel opinion, and after additional arguments the court held that the subject matter was exclusively within the jurisdiction of a three-judge district court under 28 U.S.C. § 2284. The Chief Judge of the Sixth Circuit then convened the instant court.

### B. Facts

The Ohio General Assembly is composed of two bodies, a 33–member senate, and a 99–member house of representatives. The method of apportioning the districts of the assembly is established by the Ohio Constitution. The current provision was enacted in 1967, after the previous plan was held unconstitutional. *See Nolan v. Rhodes,* 378 U.S. 556, 84 S.Ct. 1906, 12 L.Ed.2d 1034 (1964).

The House of Representatives is composed exclusively of single-member districts of substantially equal size. No district may have a population more than five per cent greater or less than the state's population divided by 99, except that this

tolerance is increased to ten per cent if it will allow the creation of a house district consisting of a single county. Ohio Const. Art. XI, § 3, § 9. When possible, house districts must be drawn to contain one or more whole counties. *Id.* at § 7(A). However, when this is not possible, a district is formed by combining the areas of counties, townships, municipalities, and city wards, giving preference in the order named. *Id.* at § 7(B). If governmental units must be divided to create districts of substantially equal size, "only one such unit may be divided between two districts, giving preference in the selection of a unit for division to a township, a city ward, a city, and a village in the order named." *Id.* at § 7(C).

Mahoning County lies in northeastern Ohio along the Pennsylvania border, about sixty miles southeast of Cleveland. Much of the county is rural. However, the northeastern quadrant of the county is dominated by the City of Youngstown. Youngstown is roughly rectangular in shape, about half again as wide as it is tall, except that the southeast corner of the rectangle,

approximately one-ninth of the total, falls outside the corporate limits. That area is occupied by Campbell City (formerly known as East Youngstown), Struthers, and Coitsville Township. The Mahoning River bisects the city, entering Youngstown in the northwest corner and winding its way southeast to Campbell City before it wanders into Pennsylvania.

In 1981, the population of Mahoning County was 289,487. The ideal house district population was 109,065, and therefore the maximum population for a house district that was not a single county was 114,518. Consequently, Mahoning County was required to contain two whole house districts and share one house district with a neighboring county. Additionally, the City of Youngstown, which had a population of 115,427, had to be divided among two districts.

The populations and racial balances of the districts established by the 1981 Apportionment Board are set forth below:

### DISTRICT 52

| | Total | Black | % Black |
|---|---|---|---|
| City of Youngstown | | | |
| Ward 2 | 16,597 | 10,341 | (62.3%) |
| Ward 7 | 17,485 | 182 | (1.04%) |
| Campbell City | 11,619 | 1,173 | (10.1%) |
| Boardman Twp. (Part) | 10,881 | 52 | (0.48%) |
| Other cities and townships | 54,793 | 578 | (1.05%) |
| Total | 110,975 | 12,326 | (11.11%) |

### DISTRICT 53

| | Total | Black | % Black |
|---|---|---|---|
| City of Youngstown | | | |
| Ward 1 | 16,667 | 9,791 | (58.74%) |
| Ward 3 | 16,761 | 7,528 | (44.91%) |
| Ward 4 | 16,168 | 339 | ( 2.1%) |
| Ward 5 | 16,430 | 4,985 | (30.3%) |
| Ward 6 | 15,719 | 5,312 | (33.79%) |
| Boardman Twp. (Part) | 30,952 | 173 | ( 0.56%) |
| Total | 112,697 | 28,128 | (24.96%) |

The plaintiffs, black voting age residents of Districts 52 and 53, assert that the apportionment between these districts unlawfully dilutes the black vote. They assert

that the boundary between the two districts divides the black population at its point of greatest concentration in a ratio of 35:65. Plaintiffs seek a reapportionment

plan which would allocate ninety-nine per cent of Mahoning County's black residents to District 53. They would do this by allocating Youngstown Ward 2 and Campbell City, currently assigned to District 52, to District 53. In exchange, they would assign all of Boardman Township to District 52. Maps showing the configurations of both the current and proposed districts may be found in Appendix I.

## II. DISCUSSION

Plaintiffs allege that the boundary at issue violates both the Fifteenth Amendment and the Voting Rights Act of 1965. The Fifteenth Amendment claim must be heard by a three-judge district court pursuant to 28 U.S.C. § 2284(a). *Armour v. Ohio*, 925 F.2d 987 (6th Cir. 1991). However, once convened, "the jurisdiction of the District Court so constituted ... extends to every question involved, whether of state or federal law, and enables the court to rest its judgment on the decisions of such of the questions as in its opinion effectively dispose of the case." *Sterling v. Constantin*, 287 U.S. 378, 393–94, 53 S.Ct. 190, 193, 77 L.Ed. 375 (1932); *U.S. v. Georgia Public Service Commission*, 371 U.S. 285, 287–88, 83 S.Ct. 397, 399, 9 L.Ed.2d 317 (1963) ("Once convened the case can be disposed of below or here on any ground, whether or not it would have justified the calling of a three-judge court.") Therefore, consistent with the judicial preference for resolving cases without reference to questions arising under the Federal Constitution whenever possible, *Hagans v. Lavine*, 415 U.S. 528, 546–47, 94 S.Ct. 1372, 1383–84, 39 L.Ed.2d 577 (1974), we will first address the statutory claim.

### A

Section 2 of the Voting Rights Act of 1965 was originally viewed as coextensive with the prohibition against discrimination contained in the text of the Fifteenth Amendment. However, after the United States Supreme Court ruled in *City of Mobile, Alabama v. Bolden*, 446 U.S. 55, 60–61, 100 S.Ct. 1490, 1496, 64 L.Ed.2d 47 (1980), that a plaintiff must show discriminatory intent to prevail on a Fifteenth Amendment claim, Congress amended Section 2 "to make clear that plaintiffs need not prove a discriminatory purpose in order to establish a violation." S.Rep. No. 97–417, p. 27, U.S.Code Cong. & Admin.News 1982, pp. 177, 204, quoted in *Chisom v. Roemer*, —— U.S. ——, ——, 111 S.Ct. 2354, 2364, 115 L.Ed.2d 348 (1991).

Section 2 as amended reads as follows: **Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation**

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [42 U.S.C. § 1973(f)(2) ], as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political processes and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

In amending Section 2, Congress intended to provide two separate claims for relief: Plaintiffs must *either* prove such intent, *or alternatively,* must show that the challenged system or practice, in the con-

text of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.

S.Rep. No. 97–417, p. 27, U.S.Code Cong. & Admin.News 1982, pp. 177, 205, (emphasis supplied), quoted in *Chisom v. Roemer*, —— U.S. ——, ——, 111 S.Ct. 2354, 2363, 115 L.Ed.2d 348 (1991). *But see Chisom*, —— U.S. at ——, 111 S.Ct. at 2369 (Scalia, J., dissenting) ("As currently written, the statute proscribes intentional discrimination only if it has a discriminatory effect, but proscribes practices with discriminatory effects whether or not intentional.") We first turn our attention to the plaintiffs' claims under the results test.

The results test under the Voting Rights Act as amended is meant to restore the pre-*Mobile* legal standard which governed cases challenging election systems or practices as an illegal dilution of the minority vote. S.Rep. No. 97–417, p. 27, quoted in *Chisom v. Roemer*, —— U.S. ——, ——, 111 S.Ct. 2354, 2364 (1991). This test asks whether "as a result of the challenged practice or structure, plaintiffs do not have an equal opportunity to participate in the political process and to elect candidates of their choice." This determination requires a searching practical evaluation of past and present reality in the region at issue.

The Senate Report lists several typical factors that may be used to establish unequal access to the political processes:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, antisingle shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;[114]

6. whether political campaigns have been characterized by overt or subtle racial appeal;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

---

[114] The courts have recognized that disproportionate educational employment [sic], income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation. [citations omitted].

S.Rep. No. 97–417, pp. 28–29, U.S.Code Cong. & Admin.News, 1982, pp. 177, 207, footnotes omitted, citing with approval *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). *See also Thornburg v. Gingles*, 478 U.S. 30, 46, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986). The Senate Committee noted that in some cases the following factors also had probative value:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 97–417, p. 29, U.S.Code Cong. & Admin.News, 1982, pp. 177, 207.

Finally, the Committee indicated that these factors are not exclusive, and that there is no requirement that any particular factors be proven or that a majority of them point one way or another. *Id.* Instead, the court must decide based on the totality of the circumstances whether the voting strength of minority voters is "minimized or cancelled out." *Id.* at 29, n. 118.

The Supreme Court's recent decision in *Thornburg v. Gingles* also offers guidance on the use of the results test. In that case, the Court concluded that the Senate Report places three limitations on the circumstances under which a Section 2 violation may be proven:

First, electoral devices, such as at-large elections, may not be considered *per se* violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process. Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation. Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it.

*Thornburg v. Gingles*, 478 U.S. 30, 46, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986).

In the instant case, the "allegedly dilutive electoral mechanism" is the placement of a district boundary. Therefore, applying the framework supplied by the Supreme Court and the Senate Report, the plaintiffs must establish that due to racial bloc voting and the totality of the past and present circumstances of blacks in Mahoning County, the district boundary minimizes or cancels out the voting strength of the minority population.

■ However, the defendants argue that in this case, there is no need to examine the totality of the circumstances because the plaintiffs do not have a large enough population to constitute a majority in a single-member district, however drawn. They assert that the Supreme Court implicitly established this size as a pre-condition to all challenges to district configurations in *Thornburg v. Gingles*. In *Gingles*, the

Supreme Court stated that "unless there is a conjunction of the following circumstances, *the use of multimember districts* generally will not impede the ability of minority voters to elect representatives of their choice." *Id.* at 48, 106 S.Ct. at 2765 (emphasis supplied). The Court then set forth three pre-conditions to a Section 2 challenge to the use of multi-member districting:

First, the minority group must demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for the minority voters' inability to elect its candidates.[17] Second, the minority group must be able to show that it is politically cohesive. If the minority group is not cohesive, it cannot be said that the selection of a multi-member electoral structure thwarts distinctive minority group interests. Third, the minority must be able to show that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

---

[17] ... The single-member district is generally the appropriate standard against which to measure minority group potential to elect, because *it is the smallest political unit from which* representatives are elected. Thus, if the minority group is spread evenly throughout the multi-member district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure.

*Id.* at 50–51, 106 S.Ct. at 2765–67 (emphasis in original) (citations omitted).

Defendants assert that the Court's reasoning compels the extension of these pre-conditions to all results test cases, adopting the logic of the three-judge district court in the *Gingles* case:

Short of [the majority] level, there is no principled basis for gauging voting strength, hence dilution of that strength. Nothing but raw intuition could be drawn upon by courts to determine in the first place the size of those smaller aggregations having sufficient group voting strength to be capable of dilution in any legally meaningful sense....

... There must obviously be some size (as well as dispersion) limits on those aggregations of voters to whom the concept can properly be applied. We do not readily perceive the limit short of the effective voting majority level that can rationally be drawn and applied.

*Gingles v. Edmisten,* 590 F.Supp. 345, 381 (1984).

Defendants also argue that these conditions should apply to challenges to single-member districts because if the government can be forced to defend a lawsuit protesting the configuration of single-member districts when the plaintiff group would not be large enough to bring suit over a multi-member districting plan due to the *Gingles* pre-conditions, then the government is effectively being punished for adopting a form of districting that is generally considered to be more favorable to minority groups.

We do not agree with defendants' analysis. In establishing threshold conditions for challenges to multi-member districts, the Court was responding to Congress' express concern that multi-member districts would be subject to challenge any time that minorities are not elected in direct proportion to their population. As the Court noted in *Gingles,* the multi-member form of districting *by itself* infringes on a minority group's opportunity to participate in the political process and elect a candidate of its choice only if the group would otherwise be guaranteed the opportunity to control at least one single-member district. The Court established threshold conditions for challenges to multi-member districts in order to enable governments to maintain

such systems without the constant threat of time-consuming and expensive litigation.

Furthermore, the Court expressly limited the application of these pre-conditions to situations in which plaintiffs were challenging *only* the multi-member districting.[1] In footnotes to its opinion, the Court noted that there were issues implicated by its interpretation of the Voting Rights Act which were not before the Court and which the Court therefore would not address. For example, the Court noted that:

... We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multi-member district impairs its ability to *influence* elections.

We note also that we have no occasion to consider whether the standards we apply to respondents' claims that multi-member districts operate to dilute the vote of geographically cohesive minority groups, that are large enough to constitute majorities in single-member districts and that are contained within the boundaries of challenged multi-member districts, are fully pertinent to other sorts of vote-dilution claims, *such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more multimember or single-member districts resulted in the dilution of the minority vote.*

... In a different kind of case, for example a gerrymander case, plaintiffs might allege that the minority group that is sufficiently large and compact to constitute a single-member district has been split between two or more multi-member or single member districts, with the effect of diluting the potential strength of the minority vote.

---

1. Indeed, there is nothing in *Gingles* that would prevent minority plaintiffs in a multi-member district that prohibited "bullet" voting or that required a majority vote to prevail in an elec-

tion from challenging the latter requirements even if the group were not large enough to challenge the multi-member form of the district. *See Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769.

*Id.* at 46 n. 12, 106 S.Ct. at 2764 n. 12; at 50 n. 16, 106 S.Ct. at 2767 n. 16. (emphasis added).

Additionally, the Court has since suggested that a dilution of minority influence may be sufficient to sustain a Section 2 results claim. In *Chisom v. Roemer,* — U.S. —, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), the Supreme Court held that Section 2 of the Voting Rights Act applied to elected judges. In the course of its analysis, the Court stated that in order to establish a Section 2 claim, the plaintiffs must show both that they have less opportunity to participate in the political process *and* that they have less opportunity to elect representatives of their choice. *Id.* at —, 111 S.Ct. at 2364. Justice Scalia dissented, arguing that this reading of the statute would leave "minorities who form such a small part of the electorate in a particular jurisdiction that they could on no conceivable basis 'elect representatives of their choice' " entirely without Section 2 protection and that they could therefore be denied equal opportunity to participate in the political process with impunity. *Id.* at —, 111 S.Ct. at 2371 (Scalia, J. dissenting). The majority responded that Justice Scalia's argument "rest[ed] on the erroneous assumption that a small group of voters can never influence the outcome of an election." *Id.* at — n. 24, 111 S.Ct. at 2365 n. 24.

Based on these statements in *Chisom* and the Court's express disclaimers regarding the scope of its decision in *Gingles,* we cannot conclude that the Court intended the *Gingles* pre-conditions for challenges to multi-member districting schemes to apply to all Section 2 challenges.[2] Therefore, we do not adopt them for the racial gerrymandering claim at issue here. While the bright-line test advocated by the defendants would indeed be simpler than a case by case analysis of the totality of the circumstances,

> [t]he standard that should be applied in litigation under § 2 is not at issue here. Even if serious problems lie ahead in applying the totality of the circumstances described in § 2(b), that task, difficult as it may prove to be, cannot justify a judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress.

*Chisom v. Roemer,* — U.S. —, —, 111 S.Ct. 2354, 2368, 115 L.Ed.2d 348 (1991).

Moreover, we reject defendants' argument that the state is being punished for adopting a single-member districting plan. While single-member districting is generally more favorable to large, compact minority populations, single-member districting plans possess their own unique opportunities for abuse, of which racial gerrymandering is a prime example.[3] We cannot agree with the defendants that a government may with impunity divide a politically cohesive, geographically compact minority population between two single member districts in which the minority vote will be consistently minimized by white bloc voting merely because the minority population does not exceed a single district's population divided by two. Accordingly, we proceed to an analysis of the totality of the circumstances in Mahoning Valley to determine whether the plaintiffs have proven that the boundary lines at issue minimize or cancel out the voting strength of the black community.

---

**2.** We recognize that some courts have applied the Gingles preconditions to cases in jurisdictions where a majority vote was not required to win the election. *Brewer v. Ham.,* 876 F.2d 448, 455 (5th Cir.1989); *McNeil v. Springfield Park District,* 851 F.2d 937, 944 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989); *Collins v. Norfolk,* 883 F.2d 1232 (4th Cir.1989), *cert. denied,* — U.S. —, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990); *Buckanaga v. Sisseton Indep. School Dist.,* 804 F.2d 469, 475 (8th Cir.1986). Because our analysis in this case is not founded on Ohio's plurality election requirement, we need only recognize that these cases involved challenges to multi-member districting and therefore are not relevant to the issues presented in this case.

**3.** Indeed, given the unique facts of this case, the plaintiffs might well benefit from a multi-member districting scheme because in a multi-member district the plaintiff group could not easily be divided.

*Totality of the Circumstances*

 At first blush, plaintiffs do not appear to have presented a very strong case. There are no allegations that laws in Mahoning County have ever prohibited blacks from voting or from registering to vote. Additionally, none of the election procedures frequently used to discriminate against minorities are present here: candidates are elected from single member districts, there is no majority vote requirement and no formal slating process, and only 150 signatures are needed to obtain a place on the ballot. Therefore, the only allegation of *de jure* discrimination is that the boundary line at issue divides the black community.

However, the Senate Report to the Voting Rights Act directs us to examine *de facto* discrimination as well as that authorized by law. We begin this analysis with an examination of the history of the area in question. Although the boundary line at issue was drawn during a statewide reapportionment, the focus of the results test is on the plaintiffs rather than the drafters, and therefore our inquiry does not focus on the black experience in the entire state but rather on the political and social reality local to the Mahoning Valley. Because more than ninety-eight per cent of Mahoning County's black population resides within the corporate limits of Youngstown, much of our discussion will necessarily be concerned with that city.

History of the Mahoning Valley

The relevant history of the Mahoning Valley is developed in detail in the record before us. It is thus established that in 1880 the City of Youngstown had a population of approximately 15,000. By the turn of the century, the population had tripled to 45,000, and by 1930 the city had swollen to over 170,000 residents due to the burgeoning steel industry that had grown up along the banks of the Mahoning River.

The ethnic composition of the area reflected a similarly dramatic change. In the nineteenth century, Youngstown was composed predominantly of "old-stock" Americans of British and German descent. However, the steel industry attracted immigrants from a variety of European countries, to the point that in 1920, more than 60% of the city's population were foreign born or first generation Americans.

During the same time period, the steel mill owners actively recruited rural southern blacks to work in the mills. Blacks were barred from membership in the steelworkers labor unions. Therefore, steel mill owners hired blacks to quell labor unrest, to break strikes, and to work at undesirable jobs that union members would not take. As a result of the recruitment by the steel mills, the black population of Youngstown increased at an even greater rate than that of the general population, jumping from less than two per cent of the population in 1900 to 6,750 in 1920 and doubling again to 14,500, over eight per cent of the city's population, by 1930. The black workers formed communities near the steel mills that employed them, settling along the river banks. Ultimately, the steel companies began to provide housing which the workers could rent and eventually own. The company housing segregated the workers by race and national origin.

The influx of blacks combined with religious and cultural differences between the primarily Protestant original settlers and the Catholic and Jewish immigrants provided fertile ground for the organization of the Ku Klux Klan, which began to organize in Youngstown in 1922. In 1923, the year that Youngstown obtained a home rule charter, *see* Ohio Const., Art. XVIII, § 7, the Klan functioned as the city's only political party, appointing precinct workers and nominating candidates.[4] That year its can-

4. The primary focus of the Klan in Youngstown appears to have been on moral reforms—enforcement of prohibition and the Sunday blue laws. However, white supremacy and racial segregation were still part of the platform. For example, the Youngstown Vindicator reported that blacks and ethnic women were harassed

when they tried to register to vote in 1923. Similarly, Herbert Armstrong testified that Klansmen wearing white hoods and riding horses had driven his father, a black merchant, into bankruptcy in 1926 because his clothing store was primarily patronized by white men. He also testified that he had personally observed

didates won six of the seven council seats, the mayoral seat, and the majority of seats on the board of education. The Klan also was responsible for the division of the city into seven wards. Each ward began at the river and moved outward, in a wedge shape, thereby dividing the mill laborers who resided along the river banks and submerging them into the general population. These wards exist essentially unchanged today.

While the Klan fell from power almost as quickly as it rose, disappearing as a major influence by 1926, racial segregation and inequality continued. Discrimination pervaded all aspects of Youngstown life. The police routinely rounded up blacks in the 1920's as a means of investigating crimes. Theaters directed black patrons to the balcony. Most restaurants denied them any but carryout service. Hotels did not always permit blacks to register. All of the city-operated swimming pools but one were restricted for white use.[5]

Discrimination was also conspicuous in city employment practices. Prior to 1960, there were no black members of the fire department. Blacks fared little better in Youngstown's Police Department: in 1976, their relative low numbers and lack of advancement opportunities were such that a number of black police officers and candidates for appointment to the department filed a lawsuit alleging racial discrimination in the department's hiring and promotional practices. *Williams v. Vukovich*, 720 F.2d 909 (6th Cir.1983). In that same year, the Office of Revenue Sharing, in response to a complaint lodged against the department, launched an investigation and found that, while Youngstown boasted a black population of 25 percent, only 7.6 percent of the police department was black. *Id.* at 914 n. 5. The investigation further uncovered that only two (6 percent) of the thirty-four officers hired the previous year were black, and that only 5 percent of the sergeants and 2.6 percent of the detectives on the police force were black.[6]

Discrimination was also evident in the city's school system. The Youngstown Board of Education had a policy against hiring black high school teachers until 1956. Black teachers also found it difficult to obtain administrative positions.[7] In 1977, the United States District Court for the Northern District of Ohio specifically found that the Youngstown public schools were racially segregated, although no relief was ordered because the segregation was not proven to result from discriminatory intent. *See Alexander v. Board of Education*, 675 F.2d 787, 795 n. 7 (6th Cir. 1982). The court also found that the school system disproportionately assigned black teachers and administrators to predominantly black schools and ordered appropriate relief. *Id.* at 790 & n. 2.

In addition to city employment, Youngstown blacks have faced discrimination in other fundamental areas throughout this century. Restrictive covenants prohibited real estate from being sold to blacks. Even after these covenants were declared unenforceable, *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), black families were unable to purchase

---

Klan activity in Youngstown, including the burning of crosses. It appears that the main reason that racial issues did not have the primacy in Youngstown that they had in other areas of the country dominated by the Klan was that there was a system of *de facto* racial segregation firmly in place before the Klan arrived.

**5.** Eventually, another white pool was constructed less than 300 feet away from the only black pool.

**6.** On the date the *Williams* case was filed, only 6.8 percent of the police department was black. A *decade* later, the city entered into a consent decree agreeing to an affirmative hiring and promotion plan.

**7.** Dr. Herbert Armstrong testified that he was not appointed to a position as principal until 1965, nine years after qualifying for the position and thirteen years after joining the school system, despite a Master's Degree in School Administration and Bachelor of Science degrees in both Education and Business Administration. He testified that the average time for a non-black teacher of similar background and experience to become a principal would have been about five years. Dr. Armstrong's eventual appointment made him the school system's first black elementary school principal.

housing in white neighborhoods.[8] Consequently, Youngstown's housing pattern has remained intensely segregated. While the fourth and seventh wards of the city are less than two per cent black, the 1980 and 1990 census data show that many areas in Youngstown are more than eighty per cent black.[9] The court takes judicial notice of the segregated white-black housing assignment policies maintained by the Youngstown Metropolitan Housing Authority. This was pursuant to the policy of the Federal Public Housing Administration that existed from the 1930's into the 1960's. Moreover, social activities remain closed to blacks. At the time of the trial in 1988, no blacks had ever been members of any of the city's three country clubs or of the Youngstown Club, the city's primary business club.

Effects of Discrimination

The effects of discrimination are apparent in the data compiled during the U.S. Department of Commerce's 1980 Census of Population and Housing (Census) and in studies conducted by plaintiffs' expert witness, Dr. Terry Buss.[10] The Census showed that in Mahoning County, the mean income for blacks in 1979 was $14,118, substantially lower than the mean income for whites of $20,259. Likewise, the Census showed that 27.3% of black families lived below the poverty level while the corresponding figure for whites was only 5.8%. Of the blacks in Mahoning County

25 years of age or older, nearly half (48.6%) had not completed high school, and only sixteen per cent had completed one or more years of college. For whites in Mahoning County, less than one-third had not completed high school, and almost one-quarter had completed at least one year of college. Finally, the Census showed that the median value of housing for blacks in Mahoning County in 1980 was $20,200, while the median value of housing for whites was $39,700. *See* Appendix II for census data.

Similarly, a 1984 study by Dr. Buss, entitled "Inequities in the Distribution of Unemployment in the Youngstown/Warren SMSA",[11] indicated that blacks were much more likely to be unemployed than whites. This study, prepared for the Ohio Bureau of Unemployment Services using the methodology used by the U.S. Bureau of the Census during its monthly population survey, showed that the unemployment rate for blacks was 37.2% while that for whites was only 15.0%. Young blacks, ages 34 and under, had the highest unemployment rate, nearly 50%. Additionally, blacks comprised more than one-quarter of the discouraged workers,[12] nearly three times the amount that would have been equivalent to whites given the racial makeup of the region. Dr. Buss testified that he had studied black and white unemployment data for the period between his 1984 study and the time of the trial and concluded that while unemployment for both groups vacillates,

---

**8.** For example, McCullough Williams testified that he had contracted to purchase a house on Volney Road and obtained financing. However, at closing, the realtor refused to sell him the property directly, stating that he would lose his real estate license if he did so. He suggested that Williams instead place the property in trust or have it purchased by a white person. Williams testified that he attempted to look at a home on Goleta Avenue and that the owner *refused to show the house.* Finally, he testified that when he sought to purchase property on which to establish a funeral home, there were only three properties that were properly zoned that realtors would show him. Similarly, A.J. Carter testified that when he came to Youngstown in 1925, he moved in with his uncle because people refused, explicitly on the basis of race, to rent to him.

**9.** The district court in the school desegregation case made the same observation in 1977. *See*

*Alexander v. Youngstown Board of Education,* 675 F.2d 787, 795 n. 7 (6th Cir.1982) (quoting 454 F.Supp. 985, 1066).

**10.** At the time of trial, Dr. Buss was the Director of the Department of Urban Studies at the University of Akron. Dr. Buss testified that he had conducted between three and four hundred surveys related to the demographics and economy of the Mahoning Valley area since obtaining his Ph.D. in political science and mathematics in 1976.

**11.** Standard Metropolitan Statistical Area, as classified by the U.S. Bureau of the Census during the 1980 Census of Population and Housing.

**12.** Discouraged workers are persons who want to work but have not sought employment in the last four weeks.

blacks consistently experienced greater unemployment rates than whites, with the rate for blacks reaching double that of whites on some occasions.[13]

While the effects of discrimination are apparent in areas of education, employment, income and health care as discussed above, the effect of discrimination against blacks in the Mahoning Valley is perhaps most apparent in political life. In the most vivid example, McCullough Williams, a leader in Youngstown's black community and one of the first black members of Youngstown's school board, testified that he received threats as a result of his civil rights activities. These threats culminated in his house being bombed in 1970. Compelling testimony was also provided by Herman "Pete" Starks regarding his candidacy for Mayor in 1985. Starks was endorsed by the party in his campaign for the Democratic primary, the only time a black candidate has received a party endorsement in a city-wide or county-wide election. Nonetheless, throughout the primary race, the media focused on Starks' race, consistently describing him as the black candidate for Mayor. Additionally, the opposition campaign used overt racial appeals. They campaigned door-to-door telling voters that if Starks was elected, his cabinet would be black. In addition, a soundtruck canvassed the city announcing that "If Pete Starks is elected Mayor, we will have a black police chief, we will have a black fire chief, and we cannot have that." Furthermore, although party rules required party officials to support the endorsed candidates, and although each precinct had committeemen who were paid to campaign for the endorsed candidates, Starks received zero votes in four precincts, including one precinct where two party officials resided. No sanctions were taken by the party against the officials or the committeemen who refused to support Starks.

Finally, the record establishes that blacks in Mahoning County participate in the political process at a lower rate than whites. From the data previously discussed indicating disparity in income, education, and employment between whites and blacks in Mahoning County, we conclude that the depressed minority political participation is the result of past discrimination. See S.Rep. No. 97–417, 28 n. 114, U.S.Code Cong. & Admin.News 1982, pp. 177, 207, quoted *supra*, at p. 1049.

Black Candidates in Elections

In the history of Mahoning County, eight blacks have run for state representative. With the exception of W.R. Stewart's election in 1904, before the population boom and the emergence of the Ku Klux Klan, none has been successful. No black has ever won a county-wide election. Only one black candidate has ever won a city-wide election other than for school board. The Honorable Lloyd Haynes was appointed to municipal court in 1972, and subsequently won election in 1978 and again in 1984. Five black candidates have won elections for the Youngstown school board. The school board election is conducted on a multi-member city-wide basis.

Racial Polarization and Political Cohesiveness

The Supreme Court's decision in *Gingles* indicates that plaintiffs must prove white bloc-voting and black political cohesiveness in order to prevail on a Section 2 claim. In this case, the plaintiffs have proven both.

Plaintiffs' expert witness, Dr. Buss, testified first to general trends in Mahoning County. Overall, blacks in Mahoning County will vote for the Democratic party candidate in the general election at a rate of between eighty and ninety per cent. Ten per cent of white voters in Mahoning County vote consistently for the Republican ticket. The remaining white voters tend to split evenly between independent candidates and the Democratic candidate.

Dr. Buss collected and evaluated data showing the voting patterns in the City of

---

**13.** Dr. Buss also conducted a survey of "Health and Human Service Needs of People in Poorer Neighborhoods" in 1985. This study focused on the twenty poorest census tracts in Youngstown. The demographics of the sample indicated that almost sixty per cent of the persons surveyed were black. The survey indicated that blacks in poor neighborhoods in Youngstown were alienated from the health and human services care delivery system.

Youngstown for 14 elections in which a black candidate had sought election. Dr. Buss conducted extreme case analysis and regression analysis to determine whether blacks and whites in Youngstown differed in their voting behavior. These techniques yielded data concerning the voting patterns of each racial group, including estimates of the percentages of members of each race who voted for each candidate.[14] His analysis showed that the relationship between the candidate's race and the race of the voter was consistently near linear[15], indicating that there is a relationship between the race of the voter and the likelihood that he will vote for a black candidate. Additionally, the analysis showed that the percentage of votes received increased as the percentage of blacks in the precinct increased.[16] Homogeneous precinct analysis, or extreme case analysis, produced similar results.

Dr. Buss's analyses showed that, on average, black voters supported black candidates at a rate of almost eighty per cent, while white voters supported black candidates at a rate of about twelve per cent.[17]

14. There are, however, certain deficiencies in plaintiffs' data. First, the trial revealed an error in the ecological bivariate regression analysis. This analysis determines whether there is a relationship between two variables, for example the race of the candidate and the race of the voter, and if so, attempts to quantify the correlation. One common approach to this analysis in voting cases is to plot the percentage vote received by a black candidate in each precinct against the percentage of black residents in that precinct. If the resulting graph is approximately linear, there is a relationship between the race of the voter and the likelihood that he would vote for a black candidate. A line of x = y indicates complete racial polarization: no whites voting for the black candidate but all blacks voting for the black candidate. In the instant case, the testimony indicated that instead of plotting votes received by the black candidate against the percentage of black residents, Dr. Buss plotted the votes received against the concentration of "non-whites" in a precinct. We find that this error most likely results in an understatement of the degree of polarization.

Additionally, we note that Dr. Buss used only data from the City of Youngstown. While city data is useful because the plaintiff class resides almost exclusively within the city limits and because the district proposed by plaintiffs is nearly coextensive with the city limits, it would have been appropriate to include all the data from the state representative elections and from Pete Starks' race for County Auditor.

Finally, it would have been useful to have statistical proof of black voting patterns in the absence of a black candidate.

15. The correlation coefficient was usually between 0.75 and 1.0. Significantly, the lowest correlation coefficient, about 0.2, appeared in the race of Benson for state representative. In this race, Benson only received 12% of the black vote. He received 6% of the white vote.

16. The slope of the graphs was consistently positive and approached one.

17. These figures do not include the race of Benson because in that election the regression analysis indicated low correlation between the race of the voter and the percentage of votes the candidate received.

The following table shows plaintiffs' extrapolations from Dr. Buss's regression analyses:

| Candidate | Black Vote | White Vote | $R^2$ |
|---|---|---|---|
| Frost, 1981 mayoral primary | 70% | 20% | 0.87 |
| Pincham, 1983 school board | 65% | 33% | 0.92 |
| Simon, 1983 school board | 60% | 8% | 0.77 |
| Rogers, 1983 school board | 73% | 12% | 0.91 |
| Frost, 1983 mayoral general | 64% | 3% | 0.96 |
| Benson, 1984 State Rep. | 12% | 7% | 0.20 |
| Jackson, 1984 Pres. primary | 98% | 2% | 0.96 |
| Simon, 1985 school board | 90% | 6% | 0.97 |
| Starks, 1985 Mayoral Primary | 98% | 6% | 0.97 |
| Starks, 1986 County Auditor | 67% | 2% | 0.67 |
| Armour, 1986 State Rep. | 48% | 4% | 0.83 |
| Hightower, 1987 school board | 90% | 20% | 0.93 |
| Pincham, 1987 school board | 80% | 35% | 0.91 |
| Jackson, 1988 Pres. primary | 98% | 9% | 0.95 |
| Average (Total/14) | 72% | 12% | 0.80 |
| Without elections for which $R^2 < 0.50$ | 77% | 12% | 0.90 |

The result of Armour's 1986 campaign for State Representative is particularly significant because in that race, the black candidate was running in a general election against an endorsed Democratic candidate. Since black voters in Mahoning County usually identify with the Democratic candidate in a general election

The rate of white support dropped to less than seven percent when school board races were excluded.

From these data, and Dr. Buss's observation that black voters in Youngstown generally vote for the Democratic candidate at a rate between eighty and ninety per cent, we find that plaintiffs constitute a politically cohesive voting unit. However, white voters in Youngstown do not support black candidates. Therefore, in the usual course of events white bloc voting will result in the defeat of the minority group's candidates.

Responsiveness

The Senate Report indicates that another factor that is sometimes useful in the totality of the circumstances analysis is the responsiveness of elected officials to plaintiffs' group. In this case, we find that the state representatives in Districts 52 and 53 have not been sensitive to the needs of the black community in Youngstown. First, we note that the representatives have little incentive to consider black voters. As demonstrated above, the black community is safely Democratic. In the absence of a black candidate, over eighty per cent of black voters will vote strictly along party lines. However, white voters in Mahoning County are less consistent, and therefore the representatives must cater to their needs in order to secure re-election. The uncontradicted evidence suggests that this is in fact the practice in Mahoning County: very little campaigning for the state representative positions has been directed toward the black community. Furthermore, black voters in these districts testified that their representatives are not responsive to minority issues, and surveys by Dr. Buss of black residents and leaders in the black community show that the representatives are perceived as indifferent to the needs of the minority community. These surveys also showed that black citizens feel that their representatives do not seek input from the black community. For example, one of Youngstown's state representatives introduced a bill into the state legislature to eliminate one of Youngstown's three municipal judgeships, the only judgeship ever held by a black, and the only city-wide position to which a black had ever been elected by a majority vote.[18]

State's Interest

Finally, the Senate Report suggests that this court may find it useful to examine the policy underlying the state's use of the challenged practice. Where the underlying policy is tenuous, the challenged practice is more likely to violate Section 2. In this case, there is simply no defensible basis for the current boundaries. The state's apportionment policies established within its constitution require that the integrity of political subdivisions be respected whenever possible. In this case, those policies were clearly violated. Article XI of the state constitution states that a house district should be formed by combining the areas of governmental units. Ohio Const., Art. XI, § 7(B). When a unit must be divided in order to create house districts of substantially equal size, "only one such unit may be divided between two districts." *Id.* at § 7(C). In this case, as more fully appears in Section B below, both the City of Youngstown and Boardman Township were divided between districts 52 and 53. Since the current configuration of the districts violates the state's own constitutional requirements, we find that the state has no interest in maintaining the current configuration.

*Conclusions*

From the totality of the above evidence, we conclude that segregation and racial discrimination have been a way of life in Mahoning County since blacks settled in

---

at a rate of eighty to ninety per cent, for an independent candidate to obtain nearly fifty per cent of the black vote is a remarkable showing.

**18.** Plaintiff Ezell Armour, who was active in many leading black community organizations including the A. Philip Randolph Institute, the NAACP, and the Ministerial Alliance, testified that the representative had not consulted with the black community regarding this legislation although he had "a lot of contact with other people." Although the record shows that the legislation was not pursued after the black community protested, we agree with the late Mr. Armour that "this was very insensitive."

the area at the turn of the century. One effect of these practices has been to foreclose the area's black residents from the political processes leading to nomination and election of candidates for any office in the Mahoning Valley, with a corresponding depression in black registration and voting rates. Additionally, the current configuration of the Ohio House of Representatives' districts deprives blacks of the opportunity to elect a candidate of their choice in either house district. They cannot elect a black representative because white voters will not support a black candidate, whether or not he has a party endorsement, and blacks are not sufficiently numerous in either district to carry an election without white support. Therefore, white race-based bloc voting works in conjunction with the division of the black voters to permit and indeed compel political parties to ignore minority candidates, and to discourage black candidates from seeking office. Defendants argue that blacks have not run in the primary elections, and that therefore they have no basis for claiming that they cannot prevail in the current districts. However, we can take notice of the tremendous expense, monetary and otherwise, of running for office, and we find that the circumstances in these two districts are such that most blacks could not reasonably have believed that they would have a chance of making a substantial showing, much less of winning.

With regard to white candidates, political reality does not encourage candidates in the current district configurations to take positions that are responsive to the needs of the black community. In the absence of a black candidate, the Democratic candidate can be assured of more than eighty per cent of the black vote simply by virtue of his party endorsement, and the Republican candidate can be assured that he will receive less than ten per cent. Therefore, candidates from both parties must, and do, focus their campaigns on winning the "swing vote"—which in these districts is primarily composed of wealthy suburban whites. Given the totality of the circumstances in this region, we can take judicial notice that the expectations of wealthy suburban voters are qualitatively different from those of the impoverished, urban black community. As a result, we conclude that under the current configurations, because the black voting strength is divided into two districts each of which contains a large population of white suburban voters, black voters in Mahoning county do not have an equal opportunity to elect a candidate of their choice for state representative.

The next question that we address is whether black voters could elect a candidate of their choice in a redrawn district.[19] For the reasons set forth below, we find that plaintiffs have shown that in the proposed district they will be able to elect a candidate of their choosing.

Defendants go to great lengths to demonstrate that based upon racial voting patterns plaintiffs will not be able to elect a black candidate without a majority of black voters in the redrawn district. However, defendants misapprehend the requirements of the Voting Rights Act. The issue is not whether the plaintiffs can elect a black candidate, but rather whether they can elect a *candidate of their choice.* We believe that they can. In a reconfigured district, plaintiffs will constitute nearly one-

---

**19.** The plaintiffs, relying on *Gingles,* 478 U.S. at 46 n. 12, 106 S.Ct. at 2764 n. 12, suggest that § 2 of the Voting Rights Act may permit an action based on a minority group's "ability to influence" an election in a single-member district which is independent of that group's ability to elect the candidate of its choice. In *Gingles,* the Supreme Court stated:

> We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-mem-

ber district, alleging that the use of a multimember district impairs its *ability to influence* elections.

478 U.S. at 46 n. 12, 106 S.Ct. at 2764 n. 12 (emphasis supplied). The plaintiffs argue that the Supreme Court's dicta here recognizes the possibility of such an action under § 2. We need not reach the question of whether such an action may be viable under the Voting Rights Act because we find that the plaintiffs have met their burden of demonstrating an ability to elect a candidate of their choice.

third of the voting age population and about half of the usual Democratic vote. Therefore, the Democratic Party and its candidates will be forced to be sensitive to the minority population by virtue of that population's size. Moreover, in a district composed only of Youngstown and Campbell, candidates and representatives will not find themselves in conflict between the interests of wealthy suburbs and the impoverished urban communities they serve. Since black voters consistently vote eighty to ninety per cent Democratic and white voters vote consistently almost fifty per cent Democratic, we find that plaintiffs could elect a candidate of their choice, although not necessarily of their race, in a reconfigured district.[20]

Therefore, based on our previous findings, we conclude that the plaintiffs have proven that the current configuration of Ohio House of Representatives Districts 52 and 53 violates the provisions of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.

### B

■ Our finding that the plaintiffs have proven their claim under the results test of Section 2 of the Voting Rights Act would ordinarily allow us to proceed to the question of relief without reaching plaintiffs' other claims. However, due to the paucity of authority regarding the application of the results test to minority populations that are not large enough to form a majority in a single-member district, we are compelled by principles of sound judicial administration to address plaintiffs' second claim under the Voting Rights Act: that the state apportionment board intentionally split the black population of Mahoning County into two districts in order to dilute the effectiveness of the minority vote. Because this claim is indistinguishable from a claim under the Fifteenth Amendment, we address these claims together.

The Fifteenth Amendment states:

**Section 1. Right of citizens to vote— Race or color not to disqualify.**

The right of citizens to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

**Section 2. Power to enforce amendment.**

The Congress shall have power to enforce this article by appropriate legislation.

This amendment prohibits states from intentionally discriminating on the basis of race in matters having to do with voting. *City of Mobile v. Bolden,* 446 U.S. 55, 61, 100 S.Ct. 1490, 1496, 64 L.Ed.2d 47 (1980).

Plaintiffs have produced strong evidence proving that the drafting of the boundary between District 52 and District 53 was racially motivated. First, Robert Dykes, a political consultant hired by the Ohio Democratic Party to draft an apportionment plan, testified that the team that designed the plan adopted by the state sought out information regarding the location of substantial black populations within the state. When the drafting team determined that there was a large enough black population to form a black majority for a district, they shifted boundaries to more closely approximate the black population. This was accomplished notwithstanding the mandate of the Ohio Constitution that "district boundaries established by the preceding appor-

---

**20.** The State of Ohio argues that the plaintiffs' claim of an ability to elect based on an alleged correlation between the outcome of the Democratic primary election and victory in the general election is flawed. We agree. Plaintiffs contend that in a redrawn district they will be able to elect a black candidate in the Democratic primary by a plurality and, because the Democratic candidate always wins the general election, they will therefore be able to elect a black candidate to office. The problem with this reasoning is that plaintiffs have demonstrated persuasively that white voters in Mahoning County do not usually vote for black candidates. Thus, there is no assurance that a black candidate winning the primary could muster sufficient white votes to be elected to office. However, our conclusion that blacks in a redrawn district could elect a candidate of their choice depends neither upon an historical correlation between the outcome of the primary and the general election nor upon speculation as to how a *black* can be elected, and therefore the inconsistency in plaintiffs' theory does not affect our conclusion.

tionment board shall be adopted to the extent reasonably consistent with the requirements of section 3 of this article." Art. XI, § 7(D). However, if the black population could not constitute a majority in a district, Dykes testified that the drafters did not attempt to conform the boundaries to black concentrations. Furthermore, the Secretary of State testified that the apportionment board was contacted by incumbents who wanted their districts "protected." Finally, the evidence showed that the incumbent legislators were white, these incumbents were supported by white voters, voting in the districts was racially polarized, and the districts were safely Democratic.

■ From this evidence, we find that the line dividing Youngstown between districts 52 and 53, when it was originally drawn in 1971 and when it was left in place in 1981, was intended to split the black community in order to dilute the potential effectiveness of the black vote, to the obvious benefit of the incumbents. Although courts are reluctant to provide relief on claims that a district has been gerrymandered to protect an incumbent's seat, *see Davis v. Bandemer*, 478 U.S. 109, 138–43, 106 S.Ct. 2797, 2813–15, 92 L.Ed.2d 85 (1986) and 478 U.S. at 143–60, 106 S.Ct. at 2815–24 (O'Connor, J., concurring), this rule does not hold when the manipulations were conducted on a race-conscious basis. Like the Seventh Circuit, we see "little point ... in distinguishing discrimination based on an ultimate objective of keeping certain white incumbents in office from discrimination borne of pure racial animus." *Ketchum v. Byrne*, 740 F.2d 1398, 1406–10 (7th Cir. 1984), *cert. denied*, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). *See also Garza v. City of Los Angeles*, 918 F.2d 763, 771 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991) (Fifteenth Amendment violation was proven when officials chose to fragment the Hispanic vote in order to preserve incumbencies). *See also Gomillion v. Lightfoot*, 364 U.S. 339, 346, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960) ("When the legislature thus singles out a readily isolated segment of a racial minority for special discriminato-ry treatment, it violates the Fifteenth Amendment.")

■ Furthermore, the districts as drawn in 1981 violate the express command in the Ohio Constitution that only one governmental unit be divided between two districts. The governmental unit that was unnecessarily divided was Boardman Township, an area with a population of 41,510 persons, only 225 of whom are black. It is apparent from the record that any reasonable division between the two districts that did not split any entity other than Youngstown would have created a district with a substantially greater black population than District 53 as currently drawn. Recognizing the admonition in *Gomillion v. Lightfoot*, 364 U.S. 339, 342, 81 S.Ct. 125, 127, 5 L.Ed.2d 110 (1960), that "the Fifteenth Amendment nullifies sophisticated as well as simple-minded modes of discrimination", we find that the deliberate combination of over 30,000 persons from a 99% white township with areas of Youngstown that were nearly half black in flagrant disregard of the state constitution's apportionment rules was not color blind. Accordingly, we find that the plaintiffs have proven that the current apportionment violates the Fifteenth Amendment.

C

The Supreme Court stated in *Constantin, supra* at page 1048 and *Railroad Commission of California v. Pacific Gas & Electric Co.*, 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319 (1938) that once a three-judge court is properly convened, it has jurisdiction to determine "all the questions in the case, local as well as federal." We recognized above that the boundary line at issue in this case violates the Ohio Constitution. While issues requiring the resolution of ambiguities in state statutes or constitutions are best reserved to state courts, there is no ambiguity here. The state constitution mandates that "only one [governmental] unit may be divided between two [house] districts." Ohio Const. Art XI, § 7(C). The City of Youngstown was more than five per cent larger than the state's population divided by 99, and it therefore

had to be divided to meet the requirements of Article XI, section 3, limiting the permissible variation in size between districts. Because Youngstown had to be divided, the state constitution compelled that all other governmental units in the two districts at issue be allocated wholly to one district or the other. The division of Boardman Township unquestionably violated this mandate.

## III. RELIEF

■ Plaintiffs seek declaratory and injunctive relief from the boundary between Districts 52 and 53. In particular, plaintiffs request an order enjoining the State from holding future elections using the current boundaries and directing the State to adopt plaintiffs' proposed districts. Finally, plaintiffs ask this court to order a special election to be held in November of 1991 to elect representatives from constitutionally drawn districts. We address these requests in sequence.

First, we find that plaintiffs are entitled to declaratory relief for the reasons discussed above, and accordingly, we declare that the current boundaries of Ohio House of Representatives Districts 52 and 53 violate the Voting Rights Act of 1965 as well as the constitutions of the United States and the State of Ohio. "[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964). In this case, the current house terms do not expire until January 1, 1993, and the Ohio Constitution requires a new statewide apportionment of the General Assembly to be published this year. Therefore, we find that there are no special circumstances which would compel us to withhold this form of injunctive relief. Consequently, we enjoin the defendants from using the current house district configurations for future elections.

However, we conclude that an order requiring the state to adopt plaintiffs' proposed districts would not be appropriate at this time. "[L]egislative reapportionment is primarily a matter for legislative consideration, and ... judicial relief [is] appropriate only when the legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Reynolds v. Sims,* 377 U.S. at 586, 84 S.Ct. at 1394; *see also Wise v. Lipscomb,* 437 U.S. 535, 539–40, 98 S.Ct. 2493, 2496–97, 57 L.Ed.2d 411 (1978). The Ohio Constitution requires the apportionment board to publish a new apportionment plan for the Ohio General Assembly by October 5, 1991 based on the 1990 decennial census. We therefore retain jurisdiction of this case to consider further injunctive relief; however, we defer a hearing on this issue until after the October deadline has passed. If at that time the reapportionment plan has not been published, or if the board's plan violates plaintiffs' statutory or constitutional rights, we will then entertain an application for an order fashioning an appropriate remedy.

Finally, with regard to plaintiffs' request for a special election from constitutionally drawn districts for the house seats expiring in January of 1993, equitable considerations require that this relief be denied. The burden of requiring the State to hold an election for these districts one month after the apportionment is published combined with the burden on the potential candidates far exceeds the burden on the plaintiffs of being represented for an additional year by legislators whom they might not have chosen had the election been held in constitutionally drawn districts. Moreover, while our broad remedial powers may permit us to order the apportionment published before the October deadline, we decline to do so. We do not believe that an earlier deadline would give the board adequate opportunity to fashion a statewide plan that meets the federal constitutional requirements announced in this opinion as well as the requirements imposed by the Ohio Constitution. Similarly, we decline to order a special election for the house seats at a later date. Although a later election would give the candidates and the state

time to prepare, the incremental cost of a special election imposes its own burdens, and the benefit to the plaintiffs diminishes as the time remaining in the existing house term expires. Therefore, we decline to compel a special election for the house districts at issue.

## IV. ATTORNEY'S FEES

■ Section 1973*l* of United States Code Title 42 provides:

> (e) Attorney's fees. In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

Under this statute, a prevailing plaintiff should ordinarily recover an attorney's fees unless special circumstances would render such an award unjust. *Hensley v. Eckerhart*, 461 U.S. 424, 429, 433 n. 7, 103 S.Ct. 1933, 1936, 1939 n. 7, 76 L.Ed.2d 40 (1983). We find that there are no circumstances that would render an award of fees unjust

in this case, and we therefore grant plaintiffs' request for fees and costs. Plaintiffs should submit a fee request with appropriate documentation to the court. Defendants will then have the opportunity to file objections to any of the charged hours if they so desire.

## V. CONCLUSION

For the reasons stated above, we find that plaintiffs' statutory and Fifteenth Amendment claims have merit, and we order the relief announced above.

While we retain jurisdiction of this case to consider plaintiffs' request for an order directing the state to adopt plaintiffs' proposed districts until after the state apportionment board publishes a new apportionment plan and to determine the amount of attorney's fees, we find that there is no just reason for delay in the entry of judgment ordering declaratory relief and enjoining future elections using the current districts, and we therefore direct that judgment be entered on those claims pursuant to Rule 54(b).

So ordered.

APPENDIX I

PERCENT BLACK PERSONS, 1980,
BY CENSUS TRACTS &
MAHONING COUNTY
HOUSE DISTRICTS

Less than 25%

25%-50%

50%-75%

Greater than 75%

House District Boundaries

Census Tract Boundaries

PROPOSED

YOUNGSTOWN
BOARDMAN
CAMPBELL
WARD 7

PERCENT BLACK PERSONS, 1980,
BY CENSUS TRACTS &
MAHONING COUNTY
HOUSE DISTRICTS

Less than 25%

25%-50%

50%-75%

Greater than 75%

House District Boundaries

Census Tract Boundaries

DISTRICTS

8109 PART Coitsville

CAMPBELL

8109 PART

8109 PART

8101

8104

8001

8003

8102

8103

8013

8012

8011

8024

8025

8026

8027.02

8027.01

8028

8029

8030

8031

8032

8123

8124

intown

APPENDIX II *

The following data are excerpted from tables published in the 1980 Census of Population and Housing Report for the Youngstown–Warren, Ohio Standard Metropolitan Statistical Area.

**Tables H–2 and H–3** Occupancy, Utilization and Financial Characteristics of Housing Units in Mahoning County

| | White | Black |
|---|---|---|
| **PERSONS IN UNIT** | | |
| 1 person | 18,849 | 3,051 |
| 2 persons | 27,780 | 3,484 |
| 3 persons | 15,629 | 2,581 |
| 4 persons | 13,980 | 2,071 |
| 5 persons | 7,135 | 1,259 |
| 6 persons | 2,867 | 626 |
| 7 persons | 1,094 | 376 |
| 8 or more persons | 457 | 237 |
| Median, occupied housing units | 2.40 | 2.62 |
| Median, owner-occupied housing units | 2.67 | 2.87 |
| Median, renter-occupied housing units | 1.70 | 2.33 |
| **VALUE** | | |
| Specified owner-occupied housing units | 58,276 | 6,707 |
| Less than $15,000 | 3,546 | 1,916 |
| $15,000 to $19,999 | 3,204 | 1,366 |
| $20,000 to $24,999 | 4,537 | 1,121 |
| $25,000 to $29,999 | 5,703 | 695 |
| $30,000 to $34,999 | 6,535 | 548 |
| $35,000 to $39,999 | 6,018 | 308 |
| $40,000 to $49,999 | 10,467 | 379 |
| $50,000 to $59,999 | 7,153 | 169 |
| $60,000 to $79,999 | 7,490 | 162 |
| $80,000 to $99,999 | 2,293 | 34 |
| $100,000 to $149,999 | 1,038 | 6 |
| $150,000 to $199,999 | 198 | 2 |
| $200,000 or more | 94 | 1 |
| Median | $ 39,700 | $ 20,200 |
| **CONTRACT RENT** | | |
| Specified renter-occupied housing units | 20,498 | 5,595 |
| Median | $ 180 | $ 107 |

Tables P–12 & P–14 Social and Labor Force Characteristics for Mahoning County: 1980

| | White | Black |
|---|---|---|
| **SCHOOL ENROLLMENT** | | |
| Persons 3 years old and over enrolled in school | 61,122 | 12,625 |
| Nursery School | 2,699 | 606 |
| Kindergarten | 3,022 | 775 |
| Elementary School (1 to 8 years) | 28,083 | 6,436 |
| High School (1 to 4 years) | 16,121 | 3,236 |
| College | 11,197 | 1,572 |
| **YEARS OF SCHOOL COMPLETED** | | |
| Persons 25 years of age or older | 153,435 | 21,364 |
| Elementary: 0 to 4 years | 3,564 | 1,518 |
| 5 to 7 years | 7,813 | 2,076 |
| 8 years | 10,996 | 1,353 |

* The Census Bureau reports include data for each of the larger municipalities within Mahoning County and for the area which the source describes as "Remainder," using separate tables for data about blacks and whites. We have combined the tables, showing only the "Total" for Mahoning County for each race. Additionally, we have omitted some of the data categories provided by the census bureau.

| | White | Black |
|---|---|---|
| **YEARS OF SCHOOL COMPLETED** | | |
| High School: 1 to 3 years | 27,279 | 5,443 |
| 4 years | 65,766 | 7,527 |
| College: 1 to 3 years | 20,021 | 2,535 |
| 4 or more years | 17,996 | 912 |
| **LABOR FORCE STATUS** | | |
| **Persons 16 years and over** | 191,484 | 28,328 |
| Labor force | 110,316 | 14,822 |
| Percent of persons 16 and over | 57.6 | 52.3 |
| Employed | 99,320 | 11,229 |
| Unemployed | 10,923 | 3,583 |
| Percent of civilian labor force | 9.9 | 24.2 |
| **LABOR FORCE STATUS IN 1979** | | |
| **Persons 16 years and over, in labor force in 1979** | 119,214 | 16,321 |
| Percent of persons 16 and over | 62.3 | 57.6 |
| Worked in 1979 | 116,806 | 14,673 |
| 40 or more weeks | 86,678 | 9,607 |
| Usually worked 35 or more hrs/week | 73,220 | 8,226 |
| 50 to 52 weeks | 70,106 | 7,067 |
| Usually worked 35 or more hrs/week | 60,844 | 6,179 |
| With unemployment in 1979 | 25,307 | 6,112 |
| Percent of those in labor force in 1979 | 21.2 | 37.4 |
| Unemployed 15 or more weeks | 9,176 | 3,225 |
| Mean weeks of unemployment | 14.5 | 20.6 |

**Tables P-13 and P-15 Occupation, Income in 1979, and Poverty Status in 1979 for Mahoning County: 1980**

Census Tracts
[400 or More White Persons and
400 or More of a Specified Racial
Group]

| | White | Black |
|---|---|---|
| **INCOME IN 1979** | | |
| **Households** | 87,969 | 13,752 |
| Less than $5,000 | 10,352 | 3,922 |
| $5,000 to $7,499 | 5,993 | 1,386 |
| $7,500 to $9,999 | 6,260 | 1,159 |
| $10,000 to $14,999 | 12,167 | 1,797 |
| $15,000 to $19,999 | 13,312 | 1,691 |
| $20,000 to $24,999 | 13,570 | 1,407 |
| $25,000 to $34,999 | 15,889 | 1,509 |
| $35,000 to $49,999 | 7,351 | 721 |
| $50,000 or more | 3,075 | 160 |
| Median | $ 18,401 | $11,047 |
| Mean | $ 20,259 | $14,118 |
| **Families** | 67,398 | 10,356 |
| Median income | $ 21,245 | $13,552 |
| Mean income | $ 23,176 | $15,896 |
| **Unrelated individuals 15 years and over** | 24,394 | 4,450 |
| Median income | $ 6,635 | $ 4,452 |
| Mean income | $ 9,186 | $ 6,722 |
| Per capita income | $ 7,323 | $ 4,696 |
| **Households** | 87,969 | 13,752 |
| With earnings | 69,349 | 9,338 |
| Mean earnings | $ 21,099 | $16,436 |
| With Social Security income | 27,184 | 3,761 |
| Mean Social Security income | $ 4,427 | $ 4,131 |
| With public assistance income | 5,465 | 4,112 |
| Mean public assistance income | $ 2,515 | $ 2,546 |

| | White | Black |
|---|---|---|
| **INCOME IN 1979 BELOW POVERTY LEVEL** | | |
| **Families** | **3,906** | **2,823** |
| Percent below poverty level | 5.8 | 27.3 |
| Householder worked in 1979 | 1,926 | 848 |
| **INCOME IN 1979 BELOW POVERTY LEVEL** | | |
| With related children under 18 years | 2,877 | 2,477 |
| Female householder, no husband present | 1,663 | 2,073 |
| Householder worked in 1979 | 655 | 562 |
| With related children under 18 years | 1,482 | 1,941 |
| With related children under 6 yrs. | 784 | 1,141 |
| Householder 65 years and over | 462 | 211 |
| **Unrelated individuals for whom poverty status is determined** | **5,285** | **1,860** |
| Percent below poverty level | 22.0 | 42.3 |
| 65 years and over | 1,943 | 549 |
| **Persons for whom poverty status is determined** | **18,818** | **12,238** |
| Percent below poverty level | 7.8 | 30.2 |
| Related children under 18 years | 6,418 | 5,828 |
| Related children 5 to 17 years | 4,655 | 3,959 |
| 60 years and over | 3,850 | 1,311 |
| 65 years and over | 2,799 | 884 |
| **Percent of persons for whom poverty status is determined** | | |
| Below 75 percent of poverty level | 5.4 | 25.0 |
| Below 125 percent of poverty level | 10.9 | 35.6 |
| Below 200 percent of poverty level | 23.3 | 51.7 |

---

BATCHELDER, District Judge, dissenting.*

I. Introduction

Plaintiffs in this case bring two claims, one for violation of Section 2 of the Voting Rights Act as amended, 42 U.S.C. § 1973, and the other for violation of the Fifteenth Amendment of the United States Constitution. I conclude that neither of these claims can be established based on the evidence presented here, and even construing the evidence as the majority construes it, neither the statute nor the 15th Amendment can be found to have been violated by the district line challenged by plaintiffs in this case. I therefore respectfully dissent.

I will first address the facts of this case in the context of the factors set forth in the Senate Report.[1] Next I will discuss the plaintiffs' statutory claim in the context of the law of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. Finally, I will analyze the plaintiffs' claim alleging an intentional violation of both the Fifteenth Amendment of the U.S. Constitution and the Voting Rights Act.

II. Totality of Circumstances Analysis: Facts and Factors

A. *Introduction*

With some very significant exceptions, I do not take issue with the majority's presentation of the facts in this case. Neither do I disagree with the majority's position that a claim of a Section 2 violation must be evaluated in light of the totality of the circumstances, including the factors set out in the Senate Report. I do, however, strongly disagree with the majority's conclusion that under the totality of the circumstances the plaintiffs have proved a Section 2 violation.

* This amended opinion has been filed to correct a typographical error.

1. Throughout the text of this opinion, I shall refer to as the "Senate Report" the Report issued by the Senate Judiciary Committee in connec-tion with the 1982 amendments to the Voting Rights Act. S.Rep. No. 417, 97th Cong., 2d Sess. at 29 & n. 114, *reprinted in* 1982 U.S.C.C.A.N. 177, 207.

The majority's analysis correctly notes that the Senate Report sets out seven factors which may be probative of the issue of whether a Section 2 violation has occurred, as well as two additional factors which may in some cases prove useful in that determination, that these factors are not exclusive, and that there is no magic number or combination of these factors which must be demonstrated in order to prove such a violation. It is important to point out, however, that as a matter of logic, in order to prove such a violation in light of the totality of the circumstances as determined by these or other factors, at least *some* of them must clearly be shown to be present. It is from this perspective that the record in this case as well as the majority opinion must be examined.

The majority introduces its analysis of the facts with the statement that, "At first blush, plaintiffs do not appear to have presented a very strong case," and proceeds from there to create a case for the plaintiffs which the evidence does not support. And contrary to the majority's conclusion, closer examination of plaintiff's case does not demonstrate some hidden strength, but rather, exposes its overall weakness.

The majority begins its analysis of the evidence with a cursory admission that three of the first four Senate Report factors are entirely lacking in this case:

> There are no allegations that laws in Mahoning County have ever prohibited blacks from voting or from registering to vote. Additionally, none of the election procedures frequently used to discriminate against minorities are present here: candidates are elected from single member districts, there is no majority vote requirement and no formal slating process, and only 150 signatures are needed to obtain a place on the ballot.

(Opinion at 1053). Following this concession, the majority discusses at length the history of the Mahoning Valley, and other aspects of *de facto* discrimination in the region, and concludes that the plaintiffs have proven, under the totality of the circumstances as determined by the Senate

Report factors, that the Section 2 of the Voting Rights Acts has been violated. The remaining Senate Report factors and the evidence in the record need to be carefully examined.

B. *The Remaining Senate Report Factors*

1. *Factor 5:* Effects of Discrimination

The Senate Report lists as one of the factors relevant to the totality of circumstances test,

> the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;[114]

---

[114] The courts have recognized that disproportionate educational [sic] employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown *and* where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.

S.Rep. No. 417, 97th Cong., 2d Sess. at 29 & n. 114, *reprinted in* 1982 U.S.C.C.A.N. 177, 207 (emphasis supplied). It is clear that for plaintiffs to establish the existence of this factor they must prove two separate elements. They must show first that past discrimination has caused disparities in education, employment, income level and living conditions, *and* second, that participation of blacks in politics is depressed. I would note that the majority's discussion of the historical accounts of discrimination goes to one single factor of the many identified in the Senate Report, namely factor number 5. I shall discuss both of these elements paying particular attention to the majority's treatment of the evidence of record as it affects the elements.

a. *Evidence of discrimination*

The historical evidence of discrimination in the Youngstown area presented by the plaintiffs in this case primarily consists of anecdotal evidence of events which occurred before 1960, and substantial portions of this evidence are from the 1920s and 1930s. From a single incident or in some cases a very few incidents the majori-

ty has generalized to its conclusions about historical discrimination in the Youngstown area. I cannot agree either with the majority's approach or its overall conclusions based on this record. I do not quarrel with the majority's conclusion that this evidence demonstrates racial discrimination, but I believe much of this activity has minimal relevance to the present case.

As a starting point, while the majority spends considerable time discussing the activities of the Ku Klux Klan in relation to Youngstown municipal government in the early 1920s (Opinion at 1053–1054, 1056), I have difficulty discerning the relevance of this activity to the legislative districting in 1971 and 1981 of the Ohio State House districts in the Youngstown area. There is some testimony in the record involving racist Klan activity directed at blacks during the 1920s. (Tr. Vol. II at 585–86).[2] In addition, William Jenkins testified on direct examination that one element of the Youngstown Ku Klux Klan's platform was white supremacy and that the Klan had been involved in the drawing of ward lines in Youngstown.[3] On cross examination, however, Jenkins testified that the Klan's agenda was primarily one of law enforcement and anti-corruption (Tr. Vol. II at 364–65), the Klan's main targets were Catholics and Southern and Eastern European immigrants (Tr. Vol. II at 365), and the prime forces behind their success in Youngstown were their stand on anti-corruption and Sunday Blue Laws, not white supremacy. (Tr. Vol. II at 365).

I do not mean to minimize the impact that the Ku Klux Klan had on the black community. However, the majority's emphasis on the Klan's historical relationship to Youngstown government seems to me to artificially add substance to their conclusions. This type of argument is a classic

fallacy of distraction, encouraging the reader to conclude that there must be continuing discrimination because the Klan was once politically involved in Youngstown politics, and not to recognize that the Klan's involvement in Youngstown government was extremely short-lived[4] and was seven decades ago.

One example of the majority's drawing a sweeping generalization from a single piece of anecdotal evidence is its statement that after the elimination of restrictive covenants against blacks, "black families were unable to purchase housing in white neighborhoods." (Opinion at 1055) (footnote omitted). In the footnote that follows that statement the majority sets forth a summary of the testimony of McCullogh Williams as proof that blacks could not purchase property in white neighborhoods. (Opinion at 1055 n. 8). Mr. Williams' testimony, however, is the *only* testimony in the entire record regarding attempts of black persons to purchase property, and nowhere in that testimony is there an indication of the time period in which he attempted to purchase residential property. (Tr. Vol. II at 458–61).

### b. Depressed Minority Political Participation

The second element of factor 5 is that black participation in the political process is depressed. Once plaintiffs have demonstrated both a history of discrimination and depressed levels of participation in the process, footnote 114 of the Senate Report permits a presumption of the causal relationship between the two. The showing of depressed levels of participation clearly is crucial to the plaintiffs' claims in this case. Thus, it is particularly troubling that the majority opinion makes a finding without citation to a single exhibit or any testimony that "the record establishes that blacks in

2. Throughout this opinion, I will refer to the transcript of the trial testimony as "Tr.", together with a reference to the volume and page number where the testimony appears.

By stipulation of the parties, this case was heard before this three-judge panel on the transcript of trial testimony, which was taken before the Magistrate in 1988, with the addition of a few exhibits.

3. Nothing in the record reflects why that ward system has not been changed or whether at-

tempts have been made in that regard. In sum, there is no evidence that it is relevant to the issues presented in this case.

4. According to the testimony of William Jenkins, the Klan administration took office in January 1924 (Tr. Vol. II at 343), and its control on Youngstown politics "declined very rapidly after the Niles Riot in November of 1924," and practically collapsed in 1925. (Tr. Vol. II at 351).

Mahoning County participate in the political process at a lower rate than whites. From the data previously discussed indicating disparity in income, education, and employment between whites and blacks in Mahoning County, we conclude that the depressed minority political participation is the result of past discrimination." (Opinion at 1056).

In fact, the evidence of record does not support the conclusion that blacks' political participation is "depressed." After combing the record in an effort to find any evidence on which the majority might have based this conclusion, I found only the statement of plaintiff's expert, Dr. Terry Buss, that "[w]hites would appear to have a higher participation rate than would blacks." (Tr. Vol. I at 132). Such an equivocal statement itself provides little support for the majority's conclusion, but when the basis for Dr. Buss' statement is examined, the accuracy of his conclusion is completely undermined. Dr. Buss testified as follows:

Q Doctor, have you engaged in any type of evaluation or attempted to measure the extent to which blacks in Mahoning County vote?

A The extent to which they vote?

Q Yes.

A Yes.

Q In what manner did you measure what I will refer to as black voter participation in Mahoning County?

A I looked at the precinct data for the City of Youngstown which I hasten to add is where all the blacks live. So we have an opportunity to examine that particular case. I do the precinct data where at least 90 percent of the population of the precinct was black which means, for all intents and purposes, it is a black neighborhood.

I also took the precincts in which ten percent or more of the population was white which means that I have white precincts. I compared the white and the

black, what we call in social sciences homogenous precincts to each other and discovered that in almost every case blacks had a lower participation rate in voting than did whites, and by lower participation rates, I mean the vote from those particular precincts in the black precincts always had a lesser percentage of people participating than those votes in the white precincts.

Q Doctor, for what years did you determine that this circumstance exists?

A I looked at the most recent primary election.

(Tr. Vol. I at 130–32).

There are at least four major problems in using this testimony to supply the foundation for the conclusion that there is depressed participation among blacks in Mahoning County. First, the election data upon which Dr. Buss based his conclusion was not from a broad cross-section of precincts in Mahoning County or in the 52nd and 53rd House Districts, but was only from the City of Youngstown. Thus, while it may provide an accurate picture of black voting levels, since as Dr. Buss testified that is where most blacks in Mahoning County reside, it does not necessarily provide an accurate assessment of white voting levels in Mahoning County or in the 52nd and 53rd Districts. Second, the testimony clearly indicates while Dr. Buss categorized precincts which had ninety percent or more blacks as "black precincts," he categorized precincts that had only ten percent or more whites as "white precincts." If that is so,[5] clearly his data could neither accurately reflect white voting levels, nor serve as the basis for any reliable comparisons of voting levels between the races.[6] Third, Dr. Buss drew his conclusion about depressed black voting levels on the basis of a *single primary election*. This cannot provide a proper foundation on which to base any conclusion other than a conclusion relative only to that primary election. It certainly cannot provide any foundation on

---

**5.** I have considered the possibility that this was a misstatement by Dr. Buss, but because the data upon which he based this conclusion appears nowhere in the record, there is nothing in the record that would indicate it is an error.

**6.** Dr. Buss' own conclusion in this regard is equivocal, "Whites *would appear to* have a higher participation rate than would blacks." (Tr. Vol. I at 132).

which to base the conclusion drawn by Dr. Buss and relied upon by the majority in this case. Fourth, nowhere in his testimony did Dr. Buss indicate the extent of the difference in black and white voting levels. Without that information, the conclusion that black political participation is "depressed" is invalid.[7]

Although footnote 114 to factor 5 in the Senate Report permits the presumption that there is a causal connection between disparate socioeconomic status and depressed levels of political participation where both past discrimination and existing depressed levels of political participation are shown by the evidence, it is absolutely clear that that is the only causal nexus presumed by the Senate Report. Nothing in the language of the statute, the Senate Report, the case law, or anything else cited by the plaintiffs, referred to in the majority opinion, or that I have been able to find stands for the proposition that if plaintiffs show a history of discrimination, the Court may presume that the level of participation in the political process is depressed. The record in this case simply does not support any finding that the level of participation of blacks in the political process is depressed, and thus, factor 5 has not been established.

**2.** *Factor 6:* Racial Appeal in Elections

The majority cites and the entire record contains but one example to show that political campaigns in Mahoning County have been characterized by overt or subtle racial appeal, the sixth of the factors in the Senate Report. (Opinion at 1056). While an accumulation of such incidents would be helpful to show support for this factor, a single incident in one election does not provide sufficient support for a conclusion that this factor is present in this case.

**3.** *Factor 7:* Extent to Which Blacks Have Been Elected

Regarding factor 7, the majority notes that only one black candidate ever has been elected state representative from Mahoning

County and none has been successful in countywide elections. However, the opinion does not mention the fact that in each of the two most recent elections in which black candidates have run for state representative, 1984 (Benson) and 1986 (Armour), the black candidate received less than half of the black vote. (Opinion at 1057 n. 17). Instead, the majority states, "[W]e can take notice of the tremendous expense, monetary and otherwise, of running for office, and we find that the circumstances in these two districts are such that most blacks could not reasonably have believed that they would have a chance of making a substantial showing, much less of winning." (Opinion at 1058–1059). I recognize that the record contains evidence that blacks have had only limited success in winning elections. But as will be discussed more fully below, the population and election statistics demonstrate that blacks clearly could have been elected in the Democratic primary elections, and the majority's conclusion seems to me to be bootstrapped from other factual findings which are also not supported by the evidence.

**4.** *Factor 2:* Polarization and Minority Voter Cohesiveness

I agree with the majority that the appropriate questions relative to factor 2 are whether the plaintiffs have proven that they are a politically cohesive voting unit, whether whites support black candidates, and whether white bloc voting usually results in the defeat of the minority group's candidates. *See Thornburg v. Gingles,* 478 U.S. 30, 56, 106 S.Ct. 2752, 2769, 92 L.Ed.2d 25 (1986) (inquiring into racially polarized voting is needed "to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates"). However, I cannot agree with the majority's conclusions that these plaintiffs are a politically cohesive voting unit, that whites do not support

---

**7.** Although the majority opinion concludes that "blacks in Mahoning County participate in the political process at a lower rate than whites" (Opinion at 24), that statement does not answer the ultimate question regarding factor 5, namely whether past discrimination "hinder[s] their ability to participate effectively in the political

process." S.Rep. 417 at 29, 1982 U.S.C.C.A.N. at 207. The opinion simply does not address the question of whether blacks *can* participate effectively in the political process. The record in this case provides no support for a conclusion that they cannot.

black candidates, and that therefore, "in the usual course of events white bloc voting will result in the defeat of the minority group's candidates." (Opinion at 1057–1058). The record in this case simply will not support these conclusions. The evidence presented at trial included data broken down by the race of the voters in only two elections for 52nd and 53rd District House of Representatives. With respect to those two elections, plaintiffs' own expert witness concluded that the 1984 election for state representative was not an example of substantively significant racial polarization, and the 1986 election for state representative was only "fairly" racially polarized. (Tr. Vol. I at 218, 219–20). The defendant's expert testified that in the 1984 race black voting was not cohesive and that in the 1986 race it was only moderately cohesive at best. (Supplemental Transcript of Testimony of John Tuchfarber, at 43, 49).

Nevertheless, the majority relies upon election statistics from elections other than House of Representative elections to arrive at its conclusion about racial polarization and minority voter cohesiveness. (Opinion at 1056–1058). I believe that those statistics may not properly form the basis for a conclusion that voting in the 52nd and 53rd House Districts is racially polarized. The Senate Report provides that courts should focus on "the extent to which voting in the elections of the state or political subdivision is racially polarized." S.Rep. 417 at 29, 1982 U.S.C.C.A.N. at 206. The relevant political subdivisions in the present case are the 52nd and 53rd State Legislative Districts, not the City of Youngstown or Mahoning County. The Supreme Court in *Gingles* stated,

> The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances. One important circumstance is the number of elections in which the minority group has sponsored candidates. Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process. Similarly,

where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim. 478 U.S. at 57 n. 25, 106 S.Ct. at 2769–70 n. 25. Since both the Senate Report and *Gingles* set forth the relevant standards, I believe that the appropriate way of treating the election data in this case is to examine only the data and testimony regarding elections in the 52nd and 53rd House Districts. Since the plaintiffs presented statistics of how both whites and blacks voted in only two of those House elections, they are the only ones that this Court may rely upon in drawing conclusions about racial polarization and minority voter cohesiveness. The inevitable conclusion from examining that data is that voting in 52nd and 53rd District elections is not racially polarized.

If, in fact, those two elections did not involve a candidate sponsored by blacks, then *Gingles* directs us to examine the other factors to determine if there is unequal access to the political process. *Gingles*, 478 U.S. at 57 n. 25, 106 S.Ct. at 2770 n. 25. The majority cites no authority which would indicate that other elections, not involving the challenged political subdivision, may be considered in determining that voting *in the political subdivision* is racially polarized. Since I believe that *Gingles*, by negative implication, stands for the proposition that other types of elections in the geographical region are not relevant,[8] there is no evidence on which to base a conclusion that minority voting is cohesive or that voting patterns are racially polarized in the 52nd and 53rd Districts.

In addition, plaintiffs presented only evidence that, in any kind of election in which a black candidate ran, blacks tended to support the black candidate and whites tended not to support the black candidate. (Tr. Vol. I at 176–221; Plaintiffs' Exhibit B at 22–31). The majority opinion here states that Dr. Buss's testimony on black voting patterns indicates that voting is racially polarized and blacks are a politically cohe-

---

**8.** There are numerous reasons why data for elections besides state house elections should not be considered. For example, in Presidential or municipal elections, the issues and concerns of voters may differ dramatically from those in state house elections.

sive voting unit because they vote for the black candidate in elections. (Opinion at 1057–1058). However, no evidence was presented on the voting patterns of blacks, or of whites, in elections in which only white candidates ran. Even the majority admits that this is a shortcoming in the data, stating that "it would have been useful to have statistical proof of black voting patterns in the absence of a black candidate." (Opinion at 1057 n. 14).

In fact, the plurality in *Gingles* stated that to determine if blacks vote as a racial bloc, the key is not whether black voters vote for a black candidate as a group, but whether they vote for a particular candidate as a group, regardless of that candidate's race. *Gingles*, 478 U.S. at 68, 106 S.Ct. at 2775 (plurality opinion). Justice Brennan stated: "Under § 2 it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate that is important. . . . Only the race of the voter, not the race of the candidate, is relevant to vote dilution analysis." *Id.* (plurality opinion). Thus, the plurality believed that courts should examine both elections in which there were black candidates and white candidates and those in which there were only white candidates ("all-white-candidate" elections).[9]

At least two Circuits have adopted Justice Brennan's reasoning and concluded that the race of a candidate is irrelevant to voter polarization and that the evidence should include data as to black voting patterns in all elections, not just ones in which a black candidate runs. The Tenth Circuit in *Sanchez v. Bond*, 875 F.2d 1488 (10th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990), stated that a rule against examining elections with only white candidates "is questionable in light of the language of § 2, which seeks to give minorities equal opportunity to 'elect representatives of their choice' . . . Nothing in the statute indicates the chosen representative of a minority group must be a minority." *Id.* at 1495. The court added

that excluding data from all-white-candidate elections is contrary to the statute's requirement that courts make a determination "from the totality of the circumstances, not from a selected set of circumstances." *Id.* Similarly, the Eleventh Circuit in *Carrollton Branch of N.A.A.C.P. v. Stallings*, 829 F.2d 1547 (11th Cir.1987), *cert. denied*, 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988), adopted the view of the *Gingles* plurality. "[A]s the plurality of the Court has said, 'both the language of § 2 and a functional understanding of the phenomenon of vote dilution, mandate the conclusion that the race of the candidate per se is irrelevant to racial bloc voting analysis.'" *Id.* at 1559 (quoting *Gingles*, 106 S.Ct. at 2775). As the withdrawn opinion of the Sixth Circuit in this case noted, "While voting in many elections is influenced by the race of the candidate, such polarization should not overshadow the significant number of voters who vote for candidates who are not members of their race, but who represent their interests." *Armour v. State of Ohio*, No. 88–4040, 1990 WL 8710, at *9 (6th Cir. Feb. 7, 1990) (opinion withdrawn). Only the Fifth Circuit has concluded that determining voter polarization and cohesiveness requires an examination of whether black voters as a group vote for black candidates in elections, rather than an examination of whether black voters vote for a particular candidate as a group, regardless of the candidate's race. *East Jefferson Coalition v. Parish of Jefferson*, 926 F.2d 487, 493 (5th Cir.1991) (district court did not err in limiting analysis to elections with black candidates); *Westwego Citizens for a Better Government v. City of Westwego*, 872 F.2d 1201, 1208 n. 7 (5th Cir.1989) ("The race of the candidate is in general of less significance than the race of the voter—but only within the context of an election that offers voters the choice of supporting a viable minority candidate."); *but see, Overton v. City of Austin*, 871 F.2d 529, 538 (5th Cir.1989) ("We do not criticize this method-

---

**9.** Justices White and O'Connor in their separate concurring opinions believed that it is appropriate for courts to focus on elections in which there were candidates of both races. *Id.* 478

U.S. at 83, 106 S.Ct. at 2783 (White, J., concurring); *id.* at 101, 106 S.Ct. 2792 (O'Connor, J., concurring).

ology [looking only at elections with a black candidate], although it is not the only permissible way to approach § 2 claims.").

It is my belief that because the statute requires a determination of the ability of the minority "to elect representatives of their choice," and because the courts have interpreted this requirement as including a determination of whether the electorate is racially polarized, if there have been elections in which black candidates have run, it is necessary to analyze both those elections and all-white-candidate elections. In this case, such a comprehensive analysis clearly was feasible. Dr. Buss has testified that 98 to 99 percent of the blacks in Mahoning County live in the two House Districts at issue. (Tr. Vol. I at 99). Census statistics also exist as to the total population of each of these two districts and of the total black population in each of these districts. (Plaintiff's Exhibit KKK). Overlaying the Census data onto the political boundaries of the county will indicate the percentages of each race located in each county. This data can be compared to existing data as to the number of eligible and actual voters in each precinct for each election. This comparison would provide information about the extent to which blacks voted in all-white-candidate elections. The evidence might have shown a pattern in which in all-white-candidate elections voter turnout fell in those precincts with larger black populations, but remained steady in those precincts with smaller black populations, and/or the evidence might have shown a pattern in which the percentage of blacks actually voting was consistently greater in elections in which there were black candidates than in elections in which there were no black candidates. If plaintiffs had shown either of those results, that would

have provided evidence that the black population is racially polarized in that blacks feel alienated in all-white-candidate elections.

### 5. *Additional Factors*
#### a. *Responsiveness of Elected Representatives*

One of the most troubling aspects of the majority's presentation of the facts in this case is its discussion of elected representatives' political responsiveness to the needs and interests of plaintiffs' minority group. In this regard, the Senate Report states,

> Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
>
>> whether there is a *significant lack of responsiveness* on the part of elected officials to the particularized needs of the members of the minority group.

S.Rep. 417 at 29, 1982 U.S.C.C.A.N. at 207 (emphasis supplied; footnote omitted).

The majority makes the finding that "the state representatives in Districts 52 and 53 have not been sensitive to the needs of the black community in Youngstown." (Opinion at 1058). In discussing this factor, the majority first notes that there is little incentive for state representatives to consider black voters, since black voters consistently vote for Democratic candidates. (Opinion at 1058). Next, they note that very little campaigning is directed toward the black community, and that opinion polls show that members of the black community perceive their representatives as being indifferent to their needs.[10] The opinion then cites a single instance of perceived insensitivity, an incident involving a legislative proposal to eliminate a municipal judgeship that was occupied by a black.

---

10. One concern I have about the majority's discussion of this factor is that with respect to the polls regarding minority perception of responsiveness, perception is not necessarily an accurate reflection of reality. This was brought to light in the on defendant's cross-examination of Dr. Buss, and the direct examination of Dr. Tuchfarber. (*See* Tr. Vol. I at 276–77; Supplemental Transcript of Tuchfarber Testimony, at 29–30). While perceptions may indeed influence the conduct of those who hold them, the Senate Report calls not for perceptions of re-

sponsiveness, but for evidence that there actually exists a significant lack of responsiveness.

In addition, even if the perceptions are accurate, it is not clear from the evidence presented in this case whether the representatives are insensitive to minority concerns, or are not concerned with the poor in the area. It would certainly be interesting to see poll results broken down by the respondents' economic level and race to see if poor whites in the area respond similarly to poor blacks, and if middle-class whites and blacks respond similarly.

(Opinion at 1058). While the majority does not explicitly state that this lack of sensitivity constitutes the unresponsiveness contemplated by the Senate Report, that conclusion is certainly implied.

I believe, however, that the record is wholly inadequate to support such a conclusion. It is important to point out that the Senate Report states that an additional factor that may have probative value in proving a violation is "whether there is a *significant* lack of responsiveness" to the particular needs of the minority group. Even assuming that the facts are as the majority has set forth, this evidence does not establish a significant lack of responsiveness.

More importantly, the majority leaves out important facts regarding the judgeship incident, the inclusion of which entirely changes the character of the incident. The majority states, "For example, one of Youngstown's state representatives introduced a bill into the state legislature to eliminate one of Youngstown's three municipal judgeships, the only judgeship ever held by a black, ..." (Opinion at 1058). A footnote to that statement reads,

> Plaintiff Ezell Armour, who was active in many leading black community organizations including the A. Philip Randolph Institute, the NAACP, and the Ministerial Alliance, testified that the representative had not consulted with the black community regarding this legislation although he had 'a lot of contact with other people.' Although the record shows that the legislation was not pursued after the black community protested, we agree with the late Mr. Armour that 'this was very insensitive.'

(Opinion at 1058 n. 18). No citation to the record appears in the majority opinion in regard to this incident.

A thorough combing of the record reveals that Ezell Armour did indeed testify on direct examination about this incident. However, Mr. Armour also testified on cross-examination, in response to questions about copies of the minutes from the City Council meeting dealing with the reduction in number of the municipal judgeships in Youngstown (Defendant's Exhibits 4 and

5), that, (1) the Youngstown City Council voted 7–0 in favor of a resolution urging that the number of the municipal judgeships on the Youngstown Municipal Court be reduced (Tr. Vol. II at 410); (2) three of the seven Council members voting in favor of the resolution were black (Tr. Vol. II at 406, 411); (3) the state representative introduced the legislation to eliminate the judgeships only after the Council had passed the resolution in favor of eliminating the judgeships (Tr. Vol. II at 411); and (4) the legislation may have been introduced at the urging of the Council. (Tr. Vol. II at 411).

#### b. State's Interest

If there is no merit to the plaintiffs' claim that under the totality of the circumstances the challenged practice has denied or abridged their right to vote, as I have concluded, then the policy underlying the State's use of the challenged practice is irrelevant to the Court's analysis of the factors contained in the Senate Report.

### C. Conclusion

In summary, then, I conclude that at best, only one of the factors in the Senate Report is supported by the evidence presented in this case. Clearly, factor one is not present, as the majority concedes. The record is wholly inadequate to support either the conclusion that black voters in the 52nd and 53rd House Districts are cohesive or that voting in those districts is racially polarized, and thus factor two has not been established. Factors three and four are not present either, and the majority has conceded that as well. As indicated above, because there is no evidence in the record to support the conclusion that black participation levels in the 52nd and 53rd Districts are depressed, factor five has not been established. Because one incident of racial appeals in an election is insufficient as a matter of law to demonstrate that political campaigns have been characterized by racial appeals, factor six has not been established. Although no black candidate for the Ohio House of Representatives has been elected in recent history, the evidence also shows that blacks have been successful in Mahoning County and in Youngs-

town in some election contests, and the statistical evidence belies the majority's conclusion that blacks could not reasonably believe that they could run for office and win. However, it is also clear that blacks have not been successful countywide. Accordingly, I acknowledge that the record does contain evidence that blacks have had only limited success in being elected, the seventh factor. With respect to the first of the additional factors identified in the Senate Report, the evidence does not demonstrate a lack of responsiveness of elected officials to the needs )f plaintiffs' group, and plaintiffs have not established this factor. Finally, because the record simply does not support any finding that under the totality of all these factors, the district line challenged by these plaintiffs denies or abridges their right to vote, the second of the additional factors in the Senate Report is irrelevant.

III. Discussion of the Law With Respect to Section 2 Claims

A. *Existence of an Influence Claim*

The plaintiffs base their claim on the premise that they have a cause of action under Section 2 for impairment of their ability to influence the outcome of elections because of the placement of the challenged district line. The majority in a footnote to its opinion concludes that it need not reach the issue of whether such a cause of action exists because it has found that the plaintiffs have met their burden of showing the ability to elect a candidate of their choice. (Opinion at 1059–1060 n. 19).

However, by concluding that plaintiffs need not constitute a majority in the reconfigured district, (Opinion at 1059, 1060), the majority opinion effectively holds that there is a cause of action under Section 2 when political boundaries are drawn so that they fail to maximize a minority group's ability to influence the outcome of elections. (Opinion at 1051–1053). For the following reasons, I conclude that no such cause of action exists under Section 2.

The support for the idea that there exists a cause of action for impairment of ability to influence the outcome of an election springs entirely from two footnotes in *Gingles* and one observation in *Chisom*. The footnotes in *Gingles* should be examined first. Footnote 12 consists of two paragraphs in which the Supreme Court makes note of what its decision in *Gingles* does not address.

The claim we address in this opinion is one in which the plaintiffs alleged and attempted to prove that their ability *to elect* the representatives of their choice was impaired by the election of a multimember electoral structure. We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability *to influence* elections.

We note also that we have no occasion to consider whether the standards we apply to respondents' claim that multimember districts operate to dilute the vote of geographically cohesive minority groups, that are large enough to constitute majorities in single-member districts and that are contained within the boundaries of the challenged multimember districts, are fully pertinent to other sorts of vote dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more multimember or single-member districts resulted in a dilution of the minority vote.

478 U.S. at 46 n. 12, 106 S.Ct. at 2764 n. 12. Footnote 16 in *Gingles* contains an observation about a possible political gerrymandering claim.

In this case, appellees allege that within each contested multimember district there exists a minority group that is sufficiently large and compact to constitute a single-member district. In a different kind of case, for example a gerrymander case, plaintiffs might allege that the minority group that is sufficiently large and compact to constitute a single-member district has been split between two or more multimember or single-member dis-

tricts, with the effect of diluting the potential strength of the minority vote.

478 U.S. at 50 n. 16, 106 S.Ct. 2766 n. 16.

Clearly, the situation presented in this case is not any of the situations described in those footnotes. The plaintiffs in this case are a minority population whose numbers are not sufficiently large to constitute a majority in a single-member district, who allege that their being divided into two single member districts constitutes an impairment of their ability to influence the outcome of elections. These plaintiffs, although they are a minority population that is not sufficiently large to constitute a majority in a single-member district, are not such a population *whose ability to influence elections is impaired by the use of multimember districts,* the subject of the speculation in the first paragraph of Footnote 12. These plaintiffs do not claim to be a minority that is *large and geographically cohesive,* whose vote is diluted because the group is split between two single-member districts, the situation described in the second paragraph of Footnote 12. Indeed, the essence of the plaintiff's claim is that they are *not* large, and that the favorable treatment given to larger concentrations of their minority group constitutes discrimination toward these plaintiffs. These plaintiffs do not claim to be a minority group *large enough to constitute a majority in a single-member district* who claim a violation of Section 2 because they have been split into two single-member districts, the subject of Footnote 16.

Turning to the reference to an "influence" claim in *Chisom,* the Supreme Court there observed only that impairment of the opportunity of a small minority group to participate in the process would impair their opportunity to influence the outcome of the election. It is clear, however, that the Court in *Chisom* did not decide what the standard was for Section 2 violations. At the very outset of its opinion, the Court specifically identified the issue before it and its holding on that issue:

The question presented by this case is whether this "results test" protects the right to vote in state judicial elections.

We hold that the coverage provided by the 1982 amendment is coextensive with the coverage provided by the Act prior to 1982 and that judicial elections are embraced within that coverage.

*Chisom v. Roemer,* —— U.S. ——, 111 S.Ct. 2354, 2358, 115 L.Ed.2d 348 (1991). After the Court reviewed the factual and procedural background of the case, it further delineated the scope of its opinion.

Our decision today is limited in character, and thus, it is useful to begin by identifying certain matters that are not in dispute. No constitutional claims are before us.... [T]his case presents solely a question of statutory construction. *That question involves only the scope of the coverage of § 2 of the Voting Rights Act as amended in 1982. We therefore do not address any question concerning the elements that must be proved to establish a violation of the Act or the remedy that might be appropriate to redress a violation if proved.*

*Id.* 111 S.Ct. at 2361 (footnotes omitted; emphasis supplied).

The *Chisom* Court went on to state explicitly, "Now plaintiffs can prevail under § 2 by demonstrating that a challenged election practice has resulted in the denial or abridgement of the right to vote based on color or race." *Id.* at 2363. After setting out the language of both subsections of Section 2, the Court turned to the question of whether the statute provides two separate types of protection for minority voters and concluded that it does not, stating,

Any abridgement of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election. As the statute is written, however, the inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process. The statute does not create two separate and distinct rights. Subsection (a) covers ev-

ery application of a qualification, standard, practice, or procedure that results in a denial or abridgement of *"the right"* to vote. The singular form is also used in subsection (b) when referring to an injury to members of the protected class who have less "opportunity" than others "to participate in the political process *and* to elect representatives of their choice." It would distort the plain meaning of the sentence to substitute the word "or" for the word "and."

*Chisom,* 111 S.Ct. at 2365. Thus, while the Court explicitly recognized that the two prongs of Section 2 set out in subsection (b), i.e. the impairment of the opportunity to participate in the political process and the impairment of the ability to elect candidates, are both essential to establish a Section 2 violation, it declined to set the standards or address the elements necessary to demonstrate the existence of those two prongs in any given case. In light of this express limitation, I believe the majority's claim that in *Chisom* the Supreme Court "suggested" that a "dilution of minority influence may be sufficient to sustain a section 2 results claim" is incorrect.

The importance of this review of the only authority for the proposition that there is a cause of action under Section 2 for impairment of the ability to influence the outcome of an election becomes clear upon a careful review of the majority opinion in this case. After its discussion of the footnotes in *Gingles,* the majority here cites *Chisom* as suggesting that a "dilution of minority influence may be sufficient to sustain a Sec-

tion 2 results claim." The majority is not suggesting that plaintiffs here have a vote dilution claim, such as that found in *Gingles* itself or contemplated by the second paragraph of footnote 12. Nor is it suggesting that plaintiffs have a Section 2 claim for impairment of their ability to influence the outcome of elections, the type of claim about which the Supreme Court speculated in the first paragraph of footnote 12 in *Gingles.* The majority here is citing *Gingles* and *Chisom* for the proposition that a minority group too small to constitute a majority in a single-member district has a cause of action for the failure of the Reapportionment Board to draw the legislative district lines so as to encompass all of this minority group within one single-member district so that their ability to influence the outcome of elections will be maximized. That is the only possible meaning of the majority's term "dilution of minority influence," and it is my belief that there is simply no support for that proposition anywhere in the law.

B. *Influence Claim in the Context of This Case*

Even if there were support for a judicially created influence claim, such a cause of action is amorphous and vague at best. The majority's holding that the first *Gingles* precondition does not apply in this case opens the door to Section 2 claims by any minority group, regardless of size, whose numbers have not been aggregated by the apportionment authorities.[11] *See Skorepa v. City of Chula Vista,* 723 F.Supp. 1384,

---

11. The majority opinion recognizes that some courts have applied the preconditions in cases in which a majority vote was not required to win the election, but distinguishes them because those cases "involved challenges to multi-member districting and therefore are not relevant to the issues presented in this case." (Opinion at 1052 n. 2). The majority does not explain, however, why the analysis should be different in a challenge to a single-member district plan.

Several cases are relevant in this regard. In *McNeil v. Springfield Park Dist.,* 851 F.2d 937 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989), the Court of Appeals for the Seventh Circuit, in requiring plaintiffs to meet the *Gingles* preconditions and in rejecting the influence claim, stated that

"[c]ourts might be flooded by the most marginal section 2 claims if plaintiffs had to show only that an electoral practice or procedure weakened their ability to influence elections." *Id.* at 947; *accord Skorepa v. City of Chula Vista,* 723 F.Supp. 1384, 1391 (S.D.Cal.1989). Similarly, in *Brewer v. Ham,* 876 F.2d 448 (5th Cir.1989), the Fifth Circuit applied the numerosity precondition to a challenge to an at-large feature of the election system. The court held, "If the minority group is dispersed throughout the electoral district or is so small in proportion to the electorate as a whole, such that even under a single-member districting plan the minority is not assured the power to elect representatives of its choice, the at-large feature of the election system, by itself, cannot be said to violate Section 2." *Id.* at 455.

**1082**

1392 (S.D.Cal.1989). This is clearly the plaintiffs' position. In response to a query about how large a group must be to bring such a claim, plaintiff's counsel stated:

> [T]here is no bright line point of demarcation. The right to influence is directly related to how severe the circumstances are in the jurisdiction.
>
> For instance, if you are looking at a jurisdiction where over a period of time there has been absolutely no blacks elected to office, if there is 100 percent polarization, it is our position that a black constituency has an enhanced case under the Voting Rights Act and the ability to influence even if there are 10, 15, or 20 of them.

(Transcript of Hearing Before Three–Judge Panel, June 18, 1991, at 69).

The *Gingles* precondition requiring numerosity was intended to provide a bright line for distinguishing cases in which a minority population forms a sufficient voting bloc that it is impaired by a challenged structure or practice. An influence claim sidesteps the *Gingles* preconditions and permits a claim for minority voters who lack the numbers necessary to elect representatives of their choice in a single-member district. Thus, within a single district, the courts could be flooded with hundreds of influence claims because minority groups of as few as ten members could assert such a claim. Indeed, plaintiffs argue that this is precisely what Section 2 requires. I would hold that the *Gingles* numerosity precondition must apply in this case to "ensure that violations for which an effective remedy exists will be considered while appropriately closing the courthouse to marginal cases." *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 943 (7th Cir.

1988), *cert. denied*, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989).

Besides requiring no numerical threshold for influence claims, the majority has suggested no standards by which to evaluate this kind of claim. There is no limit to the cause of action the majority has effectively created. As Judge Guy noted in his dissent from the Sixth Circuit's withdrawn opinion,

> According to plaintiffs' theory, this means that any system of districting, no matter how fair and impartial in its conception, is subject to attack unless it "pools" minority voters in sufficiently large enclaves so that they can "influence" the result of elections. "One man—one vote" is to be converted into "one group—one election victory."

*Armour v. State of Ohio*, No. 88–4040, 1990 WL 8710, at *10 (6th Cir. Feb. 7, 1990) (Guy, J., dissenting) (opinion withdrawn).[12] An ability to influence claim could be used to create a quota system for the election of minorities to office. This clearly is contrary to the words of the statute, which states that "nothng in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). Such a limitless and standardless cause of action is too ambiguous and unenforceable to be valid.

**C. *Ability to Elect Candidate of Choice***

The majority has held that the issue is "not whether the plaintiffs can elect a black candidate in a fairly drawn district, but whether they can elect a candidate of their choice." (Opinion at 1059). Although this was not the gravamen of the Complaint, nor was it the issue toward which what evidence there is in this case was

---

**12.** Judge Guy noted that under the plaintiffs' plan, the defendant would be subject to a claim by the blacks remaining in District 52 after the redistricting who have lost voting strength. He stated:

> For all practical purposes, plaintiffs seek to remove all the blacks from District 52 and put them in a newly structured District 53 which would be slightly reduced in population, thus further increasing black voting strength. It would also mean that in District 52 as reconstructed blacks would have little or no voting

strength or influence. In other words, plaintiffs seek to change two "maybe" districts into one sure winner and one likely loser. I am not suggesting this intent is evil, but I do suggest that if, for example, the legislature or an apportionment commission made a division of this nature, the few blacks left isolated in District 52 would certainly have a legitimate right to complain.

*Armour*, 1990 WL at 8710, at *10 (Guy, J., dissenting).

directed, nor was it ever argued, it is certainly the cause of action created by Section 2 of the Voting Rights Act. Therefore, in order to prevail, plaintiffs must present evidence that demonstrates who their candidates of choice are. To that end, evidence that regardless of whether there are black candidates in the elections, blacks in Mahoning County vote as a racially cohesive bloc; that blacks vote for the black candidate in elections in which there is a black candidate; that black voter participation declines when there is no black candidate; and that consequently the white candidate elected is clearly not their candidate of choice would have been instructive. But, plaintiffs presented only evidence that, in elections in which a black candidate ran, blacks tended to support the black candidate and whites tended not to support the black candidate. (Plaintiffs' Exhibit B at 22–31; Opinion at 1057 n. 16). Beyond this, the record is completely lacking in any evidence relevant or material to this issue.

Unless the issue is whether plaintiffs can elect *black* candidates, and the majority's opinion specifically holds that this is not the issue, it is not enough for these plaintiffs to argue that the evidence shows that, in conjunction with the other Senate Report factors, few *blacks* have been elected. If the issue is whether they can elect candidates of their choice, they must demonstrate who these candidates are. Furthermore, I believe the issue in this case is actually whether, as a result of the challenged practice or structure, the plaintiffs have had their ability to elect those candidates impaired or abridged. Footnote 17 in *Gingles* says, "Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles*, 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17 (emphasis in original). If minority plaintiffs cannot claim to have been injured by a challenged structure or practice unless they can show that they have

the potential *to elect* their chosen candidate in its absence (a much more rigorous test than that they have the potential to "influence the outcome" of the election), how much less is the claim of injury when the minority's own statistics demonstrate that with the challenged district line *exactly as it now stands*, they have the potential *to elect* their chosen candidate?

Within the current boundaries of the two districts at issue, the minority population has enough eligible voters so that, as a group, it could have in the past, and can in the future, not only *influence* elections but actually elect candidates of their choice. The statistics cited in the majority opinion show that in the 52nd District, there are 12,326 blacks among a population of 110,975, constituting 11.11 percent of the population. (Opinion at 1047). In the 53rd District, 28,128 of the 112,697 people in the district are black, making up 24.96 percent of the population. (Opinion at 1047).[13] Approximately 65 percent of the black population is eligible to vote. (Tr. Vol. I at 164–65). That means that for District 52, 8,010 blacks are eligible to vote, and in District 53, about 18,283 blacks are eligible to vote. These statistics indicate that in the 53rd District black voters have had in the past, and will continue to have in the future, the potential to elect candidates of their choice, provided they vote in sufficient numbers.

This conclusion is obvious from previous election returns. For example, in the 1986 primary election the Democratic party winner in District 53 garnered only 7,873 votes. (Plaintiff's Exhibit AA). If Plaintiff Armour had chosen to run in the Democratic primary, which he did not, Mr. Armour would have won the primary election if only 7,874 of the eligible 18,283 black voters in that district came out in support of him. The same is true of other election years. In 1982, a candidate of the black minority's choice need only have received 13,311 of the 18,283 eligible black voters in the 53rd District to have won the Demo-

---

**13.** These figures differ slightly from the figures offered in Dr. Buss's testimony. He stated that 12,608 or 11.4 percent of the population in the 52nd District is black, (Tr. Vol. I at 33), and that

23,768 or 21.1 percent of the population in the 53rd District is black. (Tr. Vol. I at 33). Nevertheless, I shall utilize the figures of the majority for the sake of consistency.

cratic primary. (Plaintiff's Exhibit AA). In 1990, the black voters' choice would have won the Democratic primary for the 53rd District by receiving 14,159 of the 18,283 eligible black votes. These results, when considered in the context of the plaintiffs' premise that the Democratic candidate always wins the general election, demonstrate that black voters in the 53rd District could have elected the candidate of their choice, whether the candidate was white or black.

Casting aside the obvious fallacy in plaintiffs' argument that they cannot now elect candidates of their choice, *viz.* that eighty to ninety percent of black voters *prefer* the Democratic candidate and express that preference consistently by voting Democrat, and those candidates win, obviously, there have been years, and will be years in the future, in which the minority population's candidate will not win even if all of its voters come to the polls, unless there was some degree of white cross-over voting. (Plaintiffs Exhibit AA & LLL). The fact that minority voters cannot elect a candidate of their choice every year, however, does not mean that minorities lack the potential to elect candidates of their choice. As stated in *Gingles*, the test for whether a challenged practice operates to cancel out the voting population's strength is that "where minority and majority voters *consistently* prefer different candidates, the majority, by virtue of its numerical superiority, will *regularly* defeat the choices of minority voters." *Gingles*, 478 U.S. at 48, 106 S.Ct. at 2765 (emphasis added). In the present case, the majority's "numerical superiority" would not have *regularly* defeated the minority's candidate of choice. In fact, in three of the last five Ohio House elections since 1981, the eligible minority voters could have defeated all other candidates in the Democratic primary in one of the two challenged districts merely because of *their* numerical superiority. (Plaintiff's Exhibits AA & LLL).

If the black voters are sufficiently politically cohesive to vote as a bloc for their candidate of choice in the Democratic primary, and if, as the plaintiffs contend, this is tantamount to election because the Democratic primary winner has always prevailed in the general election in both District 52 and District 53, then black voters under the current boundary between the districts have the potential to win both the primary and general elections in at least one of the two districts. The minority's potential to go beyond merely influencing an election and to actually elect "representatives of their choice" depends only on their fielding a candidate of choice in the primary and then showing up on election day to cast their votes.

## IV. Claim of Intentional Violation Under Both the 15th Amendment and the Voting Rights Act

The majority concludes that there has been a violation of the Fifteenth Amendment of the United States Constitution and of the intent prong of Section 2. The Fifteenth Amendment provides, "The rights of citizens to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." This provision prohibits intentional discrimination on the basis of race in matters relating to voting, *City of Mobile v. Bolden*, 446 U.S. 55, 61–62, 100 S.Ct. 1490, 1496–97, 64 L.Ed.2d 47 (1980), and is coextensive with the intent prong of Section 2. Like the majority, I shall discuss these claims together.

The majority's opinion concludes as follows:

Plaintiffs have produced strong evidence proving that the drafting of the boundary between District 52 and District 53 was racially motivated. First, Robert Dykes, a political consultant hired by the Ohio Democratic Party to draft an apportionment plan, testified that the team that designed the plan adopted by the state sought out information regarding the location of substantial black populations within the state. When the drafting team determined that there was a large enough black population to form a black majority for a district, they shifted boundaries to more closely approximate the black population. This was accomplished notwithstanding the mandate

of the Ohio Constitution that "district boundaries established by the preceding apportionment board shall be adopted to the extent reasonably consistent with the requirements of section 3 of this article." Art. XI, § 7(D). However, if the black population could not constitute a majority in a district, Dykes testified that the drafters did not attempt to conform the boundaries to black concentrations. Furthermore, the Secretary of State testified that the apportionment board was contacted by incumbents who wanted their districts "protected." Finally, the evidence showed that the incumbent legislators were white, these incumbents were supported by white voters, voting in the districts was racially polarized, and the districts were safely Democratic.

From this evidence, we find that the line dividing Youngstown between district 52 and 53, when it was originally drawn in 1971 and when it was left in place in 1981, was intended to split the black community in order to dilute the potential effectiveness of the black vote, to the obvious benefits of the incumbents.

(Opinion at 1060–1061). Although the majority opinion does not cite specific portions of the record that would support its version of the facts quoted above, after a thorough review of the record I have determined that the only evidence anywhere in this record which could be construed to relate to incumbency or the drawing of district lines to preserve incumbents is found in the deposition of Anthony Celebrezze, Jr., who was Secretary of State when the challenged district line was preserved in the 1981 reapportionment, presented as Defendant's Exhibit 22, and in the trial testimony of Robert Dykes. Because it is inconceivable to me that this testimony could have been construed to prove what the majority opinion says—that the plaintiffs have produced strong evidence of discriminatory intent—I shall set forth the testimony of Messrs. Celebrezze and Dykes at length below.[14]

The only portion of Mr. Celebrezze's testimony that could possibly be construed as related to the majority's discussion appears at pages 15–18, and is reprinted below in its entirety:

Q. Do you know where the data that was developed by the Democratic Party for its plan, do you know where that data is located now?

A. No, I don't.

Q. Now, in the formulation of the Democratic proposal concerning the 1981 reapportionment, do you know whether information concerning the racial composition of the various locations around the state, if that information was considered in drawing district lines?

A. I don't know directly that it was considered. I know that there was an effort to protect minority incumbents, especially in Cuyahoga County, in drawing the lines in Cuyahoga County, because that was something that was discussed in meetings that I was at. How that translated into physically drawing the lines, I just don't know.

Q. Now, this effort that was undertaken in relation to Cuyahoga County, who initiated that concern, or what was the source when you say you talked about—

A. My understanding was not only minority incumbents but all incumbents in an apportionment process who are very concerned about their, districts and what is going to happen. There were a fairly substantial number of contacts made to try and protect incumbents' districts whenever possible. It's a natural thing for an incumbent to do.

Q. But my question is: Was there a concerted or special effort to protect certain minority districts because they were represented by minority group members rather than because they were incumbents?

A. Yes.

---

**14.** I note in passing that the majority's reference to a violation of the Ohio Constitution is wholly irrelevant to the issues presented in this case. Whether districts other than 52 and 53 were drawn in order to create or maintain black majorities is completely irrelevant to these plaintiffs' challenge of the line dividing the 52nd and 53rd Districts.

**Q.** And from whom did that concern emanate?

**A.** Mainly from the incumbents. That's the only place that I am aware that the discussions came from.

**Q.** I'm asking if Mr. Tipps or Mr. Lehy or someone like that—was that established as a high priority by the leadership of the Democratic Party?

**A.** It was established as a priority within the context of following the Constitution. There was an awareness that minority districts should be protected, if that was possible. I think it was a conscious decision to try to protect minority incumbents. How that translated into the actual plan, I am not aware because I wasn't there when they were doing the actual plan.

**Q.** I'm interested in this point because I am trying to determine what procedure could have been or what the objective was in relation to minority districts, as distinguished from districts which Democratic officeholders at the time of the reapportionment encumbered. I'm trying to determine what the initiative was at the Democratic Party level to provide—your response to the previous question suggests that there were some additional measures taken for that.

**A.** There were measures taken to protect, to protect minority incumbents. Beyond that, the only guidance that was given as far as developing a plan was to follow the Constitution, which basically says that counties have to remain whole, if possible. You get into townships, cities, city wards, villages. And our guidance was to follow that, follow that mandate of the Ohio Constitution.

(Defendant's Exhibit 22, Deposition of Anthony Celebrezze, at 15–18).

From this testimony one simply cannot draw the conclusion that in 1981 the lines were drawn (or more accurately, were left where they were) with the intent to discriminate against blacks. In fact, Mr. Celebrezze's testimony establishes nothing more than that, in creating or maintaining legislative districts, the reapportionment board sought to protect minority incumbents and follow the Constitution. This evidence cannot support a conclusion that the lines were drawn with racial animus.

In 1981, Robert Dykes was hired by the Democratic party as a technical consultant to aid members of the Reapportionment Board in drawing a plan of the Ohio House and Senate Districts. (Tr. Vol. II at 478–79). On direct examination by plaintiff's counsel, Mr. Dykes first noted that the line between the current 52nd and 53rd House Districts actually had been established in the previous reapportionment in 1971, and was merely followed in 1981. (Tr. Vol. II at 492). His testimony continued as follows,

Q Sir, do you recognize Plaintiffs' Exhibit G?

A I do.

Q Sir, would you please state what Plaintiffs' Exhibit G is?

A I believe Plaintiffs' Exhibit G represents a graphic representation of the House District lines in Mahoning County as they exist today.

Q Sir, are these the lines that you either followed or drew at the time that you performed your work on behalf of the Ohio Democratic party?

A They are.

Q Sir, do you recall whether this was the initial configuration which you submitted to the Democratic party for Mahoning County?

A As I said, I don't recall with certainty, but I do believe it was.

Q Sir, did you speak to any of the encumbent [sic] legislators from Mahoning County at the time that you submitted your initial plan for Mahoning County?

A Again, I have tried to recall this, and I'm not certain. I believe we did, but I'm not positive.

Q Sir, do you recall who the encumbent [sic] legislators were at the time?

A I do not.

Q Sir, do you know whether the plan that you submitted to the Democratic party for Mahoning County was the plan that was subsequently adopted by the Ohio Apportionment Board?

A I believe it was.

THE COURT: Excuse me, that is the plan you drafted?

THE WITNESS: That is.

THE COURT: Was adopted or accepted by your employers, the Democratic party, and then subsequently accepted by the Apportionment Committee or Board?

THE WITNESS: Yes, by the majority of the Board because the vote was strictly along party lines in the Board.

Q Do you know how many Democrats there were on the Board?

A I believe there were, well, I can't remember if the Board was five or seven. It was either three to two or four to three, whichever way it was.

Q Sir, at the time that you drew the line for Mahoning County or you followed the previous line, did you know the racial composition and location of blacks in Mahoning County?

A We did.

Q Sir, did you calculate the total number of blacks in Mahoning County?

A The total number of black people in Mahoning County and indeed every county in the State was provided to us by the U.S. Census, so we had that number.

Q Sir, did you testify what guidance, if any, that you received from the Ohio Democratic party concerning how to apportion counties where there were black populations?

A Well, as I may have mentioned earlier, I'm not sure we did for the eight major cities of the state, and for the eight major counties of the state, really, look at the racial characteristics of the populations, and we certainly had black members of the House and the Senate at that time, and in drawing the District, we paid some cognizance to where the black population was in those counties in drawing those lines.

Q Sir, did that cognizance prompt a particular course of action in terms of where the lines would be located?

A To some degree.

Q Sir, to what degree?

A Well, clearly we were not going to, if it would have meant violating on the rules we laid down that were laid down in the Constitution, we would not do that, I don't think. I don't recall us doing that, but if it did not, we would certainly look at the black population as a factor in drawing the lines and in certainly drawing to concentrate the black population in districts represented by black legislators.

Q Was there a different approach in districts that were not represented by a black legislator?

A I think there was a different approach in districts that were in counties or areas of the state that did not have substantial black population; for example, and the reason I answered that way is because we have a black State Representative from Akron.

Now, we did not have one then. There was substantial black population in Akron. It was all in one district before we drew the lines, as I recall, and we really made no adjustment. The lines in Summit county were adjusted to some extent, but I don't recall in that case that we made any adjustment, but we certainly looked at it to see if the black population in Summit County was basically in one district, and the reason we did that is there clearly in Summit County was enough black population to form a black majority for a district, and, indeed, we have a black representative today from Summit County.

Q Now, doctor, you have used the term "substantial black population." What do you mean by substantial black population?

A An area in which the majority of the people in the district would be black.

Q Why did you rely on the point of demarcation of majority of blacks in determining where lines would be drawn?

A I don't recall exactly why that was the point of demarcation.

Q Was that a decision that you made?

A I don't honestly recall.

Q You don't recall whether you decided that or not?

A I suspect not, but I can't, I cannot give you a conclusive answer.

Q Do you recall whether you received any guidance from the Ohio Democratic party concerning treatment of the black population in connection with the configuration of the District.

A Yes, I'm sure I did. In terms of specifics, exactly how it was, you know, put, it is difficult to remember after all these years exactly what was said.

(Tr. Vol. II at 492–97). After a discussion of the census tracts in Mahoning County, the following colloquy occurred,

Q Now, sir, as you went down the census tracts in Mahoning County, did you know, for instance, in [tract] 8002, did you know the racial makeup of that area?

A We did.

Q What use would you make of that information?

A In the case of Mahoning County, to the best of my recollection, we gathered the data, but we did not specifically use it because there was not a majority of black population in the county, a majority of a district.

. . . .

Q So did you take cognizance of where blacks lived, for instance, in Mahoning County in relation to one another?

A We knew where they lived, but in drawing the line in Mahoning County and in the City of Youngstown, with the City of Youngstown, in particular, we kept the line where it was in the previous reapportionment. So we did not pay specific cognizance to the black population; although we knew where it was.

Q Was your approach different than what you have previously referrred [sic] to as the six major metropolitan areas?

A Yes, the approach was different in those areas.

Q What did you do in those areas?

A Well, I should say—let me correct myself and say that it was principally the same but there were differences. The part that was the same was the procedure of matching census geography to political geography. In the case of Cleveland, in which we are sitting, we calculated the population of each ward of the City, and we calculated the population of black persons and white persons in each of those wards. In the case of the City of Cleveland or Cuyahoga County, more particularly, as we have a substantial suburban black population as well, we did take some cognizance to where the black population was in the City of Cleveland.

We had black representatives at that time, and we certainly could form a majority black district, and so, again, adhering to the rules that the Constitution set down, and within those rules, we also paid some cognizance to the black population.

(Tr. Vol. II at 503–05).

If, in fact, the majority is relying on Mr. Dykes' testimony to support its argument, what the majority is saying is that if in drawing district lines a reapportionment board looks at population breakdowns by race in districts where blacks could constitute a majority, then not looking at the racial composition in districts where blacks could not constitute a majority is intentional discrimination. Under that interpretation of the United States Constitution, any time a reapportionment board attempts to maintain or create a majority black district—which such boards would certainly believe they are obliged to do whenever the black population is sufficient to enable them to do so—but fails to draw districts which maximize the voting strength of blacks where their numbers are not sufficient to permit the drawing of a district in which they could constitute a majority, the board violates the 15th Amendment. To put it another way, to find that the actions of the board in this case were in violation of the 15th Amendment is to find that taking into account the race of a geographically cohesive group of blacks large enough to constitute a majority in a legislative district is to discriminate against smaller groups of that race, and to do so *on the basis of their race*. Or, not maximizing the ability of any group of blacks, regardless of size, is to intentionally discriminate against them, on the basis of their race. I

cannot accept this notion. The 15th Amendment does not require states to maximize the voting strength of each and every minority voter; it prohibits the imposition of voting practices or procedures with the intent to deny or abridge the right to vote.

To support its conclusion that there was intentional discrimination by the defendant in this case, the majority cites *Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir.1984), *cert. denied*, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985), and *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). Even a brief review of those cases demonstrates how radically different they are from the case at bar. In *Ketchum*, the court specifically declined to make a finding regarding intentional discrimination. 740 F.2d at 1409. Had the Court made such a determination, however, its conclusion could have been supported by quite substantial evidence.

First, there is the retrogression, in the context of a substantial increase in the percentage of blacks in the population, from nineteen majority black wards in 1980 under the 1970 map to seventeen majority black wards under the 1981 City Council map.

. . . .

Second, discrimination may be identified in the manipulation of certain ward boundaries to adjust the relative size of racial groups in the City Council map. For example, before the 1981 redistricting, four wards—the 7th, 15th, 18th and 37th Wards—had populations in excess of the 60,101 required under the redistricting plan. Population therefore had to be moved out of those wards in order to accomplish the redistricting mandate. Three of the four wards had strong, but not overwhelming, black majorities. The fourth ward (the 18th) had a strong black plurality. In order to accomplish the required redistribution of population, however, blacks were moved out of these wards in much greater numbers than their proportion of the population and in greater numbers than required to accomplish the necessary reduction. Additional people, comprising a mix of blacks and non-minorities, were then moved into these wards to make up the deficit with a resulting sharp reduction in the proportion of blacks in those wards.

. . . .

We have discussed above several examples of the dilution of minority voting strength through manipulation of ward boundaries. Appellants have alleged instances of packing (the "wasting" of black votes through unnecessary concentration, . . .), in that fourteen of the seventeen majority black wards have black populations in excess of 89%, while only six majority white wards have majorities at comparable levels. There are also allegations of fracturing of the black communities on both the West and South Sides, so that certain black population, which could have been used to form additional black majority wards, was instead split off to form sizeable black minorities with white majority wards.

740 F.2d at 1407–09 (citations and footnote omitted). Thus, *Ketchum* involved active redrawing of district lines to dilute the vote of blacks and to preserve white majorities.

*Garza* dealt with an Hispanic challenge to the boundaries of the Los Angeles County Board of Supervisors. The district court made explicit findings with regard to three separate redistrictings that occurred in 1959, 1965, and 1971 for which there was substantial evidence, both direct and circumstantial, that the lines had been *redrawn* to preserve incumbents' positions. 918 F.2d at 766–77 n. 1. The district court also made extensive findings about how the 1981 redistricting occurred, including direct and circumstantial evidence of an intent to prevent Hispanics from constituting too large a group in an incumbent's district. *Id.* at 767–68 n. 1. The court of appeals affirmed the finding of intentional discrimination, rejecting the County's argument that the commissioners were merely preserving their incumbencies, "[T]he [district] court also found that they chose *fragmentation* of the Hispanic voting population as the avenue by which to achieve this self-preservation. The supervisors intended to

create the very discriminatory result that occurred." *Id.* at 771 (emphasis supplied).

The factual situations in those cases are dramatically different from that in the present case, in which the district line was not changed at all in 1981 based on the recognition that blacks could not form a majority in the 52nd and/or 53rd Districts. I would also note that the majority contends that the lines were drawn in 1971 with discriminatory intent, (Opinion at 1083), but fails to cite any evidence, either direct or circumstantial, of such animus.

V. Conclusion

For the reasons set forth above, I respectfully dissent from the majority's opinion.[15]

15. Because I find that neither Section 2 nor the Fifteenth Amendment has been violated, I have no occasion to address the majority's conclusion that blacks could elect candidates of their choice in a reconfigured district.